# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS


In the matter of the Life        )
Term Parole Consideration        )        CDC Number D-16017
Hearing of:                      )
                                 )        COPY
ISIDORO DELUNA                   )
                                 )        INMATE
_____)


CALIFORNIA MEN'S COLONY

SAN LUIS OBISPO, CALIFORNIA

APRIL 27, 2005

3:38 P.M.


PANEL PRESENT:

AL ANGELE, Presiding Commissioner
B. RODRIGUEZ, Deputy Commissioner

OTHERS PRESENT:

ISIDORO DELUNA, Inmate
MARY ANN TARDIFF, Attorney for Inmate
RONALD RICO, Deputy District Attorney
JOHN MORENO, Interpreter


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum


**Kristin Ledbetter**        **Capitol Electronic Reporting**

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 14 |
| Pre-Commitment Factors | 20 |
| Post-Commitment Factors | 34 |
| Parole Plans | 24 |
| Closing Statements | 60 |
| Recess | 75 |
| Decision | 76 |
| Adjournment | 82 |
| Transcriber Certification | 83 |

--oOo--

1

1    **P R O C E E D I N G S**

2        **PRESIDING COMMISSIONER ANGELE:**   This is

3    going to be a Subsequent Parole Consideration

4    Hearing for Isidoro DeLuna, CDC number D David

5    16017.   Today's date is April 27, 2005.   The time

6    is approximately 3:38 p.m.   We're located at CMC

7    East.   This hearing is being conducted by way of

8    video conference between CMC East and the Santa

9    Clara County District Attorney's Office.   The

10   inmate was received October 22nd, 1985, the life

11   term started on August 23rd, 1986, from Santa Clara

12   County, the charge of murder in the second degree

13   with use of a firearm, case number S as Sam C

14   Charles L Lincoln 101944.

15       **DEPUTY DISTRICT ATTORNEY RICO:**

16   Commissioner, I'm sorry to interrupt.   I'm having a

17   difficult, I'm having a difficult time hearing you,

18   Commissioner, over the interpreter's voice, and I'm

19   wondering if the recording, if the recording is

20   picking up your voice or just the interpreter's

21   (inaudible).

22       **PRESIDING COMMISSIONER ANGELE:**   How about

23   now?

24       **DEPUTY DISTRICT ATTORNEY RICO:**   That's

25   better, and I don't know if it would be, but I

26   don't know about the audio recording, if both you

27   and the interpreter are talking at equal volume.

2

1     **PRESIDING COMMISSIONER ANGELE:**  We'll try

2  it.

3     **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.  Thank

4  you.

5     **PRESIDING COMMISSIONER ANGELE:**  Count number

6  one, 187 of the Penal Code, 12022.5 of the Penal

7  Code, (inaudible) 15 years to life plus two with an

8  MEPD of 8/17/96.  Mr. DeLuna, this hearing is being

9  tape-recorded, and for the purpose of voice-

10  identification each of us state our first name and

11  last name, spelling our last name.  When it comes

12  to your turn, after you spell your last name, give

13  us your CDC number.  I'm going to go to my left,

14  excuse me, I'm going to go to my right.  My name is

15  Al Angele, A-N-G-E-L-E, Commissioner, Board of

16  Prison Terms.

17     **DEPUTY COMMISSIONER RODRIGUEZ:**  B.

18  Rodriguez, R-O-D-R-I-G-U-E-Z, Associate Chief

19  Deputy Commissioner acting, Board of Prison Terms.

20     **INMATE DELUNA:**  My name is DeLuna.

21     **INTERPRETER MORENO:**  John Moreno,

22  M-O-R-E-N-O, Interpreter.

23     **INMATE DELUNA:**  My name is DeLuna.  It is

24  I-S-I-D-O-R-O D-E-L-U-N-A, D-16017.

25     **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

26  T-A-R-D-I double F, attorney for Mr. DeLuna.

27     **DEPUTY DISTRICT ATTORNEY RICO:**  In Santa

3

1    Clara County, Ronald Rico, R-I-C-O, Deputy District

2    Attorney, Santa Clara County DA's Office by video

3    conference.  I'm the only one in the room.

4         PRESIDING COMMISSIONER ANGELE:  Let the

5    record reflect that there's also a correctional

6    officer in the room for security purposes and will

7    not be participating in today's hearing.  Mr.

8    Moreno, would you, first let me swear you in.

9    Raise your right hand, please.  Do you solemnly or

10   affirm that you'll translate Spanish into English

11   and English into Spanish to the best of your

12   ability during this hearing?

13        INTERPRETER MORENO:  I do.

14        PRESIDING COMMISSIONER ANGELE:  Thank you.

15   Would you read that statement ADA Statement to the

16   inmate?

17        INTERPRETER MORENO:  In English or in

18   Spanish?

19        PRESIDING COMMISSIONER ANGELE:  In Spanish.

20        INTERPRETER MORENO:  In Spanish.  Okay.

21        PRESIDING COMMISSIONER ANGELE:  Would you

22   ask him if he understands his rights of the

23   Americans with Disabilities Act?

24        INMATE DELUNA THROUGH INTERPRETER:  Some.

25        PRESIDING COMMISSIONER ANGELE:  All right.

26   Would you explain to him that if he has any sort of

27   a disability such as seeing, hearing, walking,

4

1  talking that we are required to provide him with an

2  accommodation in order that he can see, talk, hear,

3  walk. Does he understand?

4      INMATE DELUNA THROUGH INTERPRETER:  Yeah.

5      PRESIDING COMMISSIONER ANGELE:  He

6  understands.

7      INMATE DELUNA THROUGH INTERPRETER:  Yes.

8      PRESIDING COMMISSIONER ANGELE:  Okay. Now,

9  the record reflects that he signed BPT Form 1073,

10  and that was on March the 14th of 2005, and that's

11  the reasonable accommodation notice and request in

12  accordance with the provisions in the Americans

13  with Disabilities Act indicating that he does have

14  a disability as defined under the ADA, and that the

15  disability is understanding and learning the

16  English language, reading, talking, and that he

17  does require a Spanish interpreter, and that

18  interpreter has been provided for him. Is that

19  information correct, Mr. DeLuna?

20      INMATE DELUNA THROUGH INTERPRETER:  Well, it

21  could be that it may not be correct because you

22  want me to speak your language, but I prefer to

23  have it done in Spanish.

24      PRESIDING COMMISSIONER ANGELE:  My question

25  to him, is the statement correct that he needed a

26  Spanish interpreter?

27      INMATE DELUNA THROUGH INTERPRETER:  Yes,

5

1    Sir.

2        PRESIDING COMMISSIONER ANGELE:  Okay.  Now,

3    you already said you need glasses in order to read,

4    and you don't have those.

5        INMATE DELUNA THROUGH INTERPRETER:  Yes, I

6    do need them.  I don't have them.  It's been more

7    or less about three years that I've asked for them.

8        PRESIDING COMMISSIONER ANGELE:  What

9    institution were you at when you asked for them?

10        INMATE DELUNA:  In Soledad.

11        PRESIDING COMMISSIONER ANGELE:  Okay.  Do

12    you -- I will make a notation that you should have

13    some sort of glasses provided for you so you can

14    see properly.

15        INMATE DELUNA THROUGH INTERPRETER:  Very

16    well.

17        PRESIDING COMMISSIONER ANGELE:  Do you have

18    any hearing impairments?

19        INMATE DELUNA THROUGH INTERPRETER:  Yes.  I

20    can hear fine.

21        PRESIDING COMMISSIONER ANGELE:  All right.

22    Do you have any problems walking up and down stairs

23    or for distances of 100 yards or more?

24        INMATE DELUNA THROUGH INTERPRETER:  No.  I

25    don't have a problem with that.

26        PRESIDING COMMISSIONER ANGELE:  Have you

27    ever been included in Triple CMS or EOP Programs?

6

1          INMATE DELUNA THROUGH INTERPRETER:   I've

2     been in programs.

3          PRESIDING COMMISSIONER ANGELE:   Does he know

4     what Triple CMS means or EOP means?

5          INMATE DELUNA THROUGH INTERPRETER:   EOP for

6     --

7          PRESIDING COMMISSIONER ANGELE:   Mental

8     Health Delivery System.

9          INMATE DELUNA THROUGH INTERPRETER:   Yes, it

10    has to do with illnesses.

11         PRESIDING COMMISSIONER ANGELE:   Has he ever

12    been involved in the Mental Health Delivery System

13    as a patient?

14         INMATE DELUNA THROUGH INTERPRETER:   Not too

15    much but for a treatment of programs, about two or

16    three months, about two or three months, just two

17    or three months for the program with illnesses and

18    so on.

19         PRESIDING COMMISSIONER ANGELE:   What

20    illness?   What is he talking about?

21         INMATE DELUNA THROUGH INTERPRETER:

22    Venereal.

23         ATTORNEY TARDIFF:   Oh, he's talking about

24    Peer Education.

25         PRESIDING COMMISSIONER ANGELE:   I don't know

26    how to get this across, so what I want him to tell

27    me, the prison has a mental treatment facility.   It

7

1    is the Mental Health Delivery System, Mental Health

2    Care Delivery System, and it's referred to as

3    Triple CMS or EOP.  Has he ever been a patient in

4    the Mental Health Service Delivery System?

5          INMATE DELUNA THROUGH INTERPRETER:  No.

6    They haven't taken me for that.

7          PRESIDING COMMISSIONER ANGELE:  Has he ever

8    taken any psychotropic medication?

9          INMATE DELUNA THROUGH INTERPRETER:

10   Medication.  I've taken plenty of medication.

11         PRESIDING COMMISSIONER ANGELE:  Psychotropic

12   medication.

13         INMATE DELUNA THROUGH INTERPRETER:  No.

14         PRESIDING COMMISSIONER ANGELE:  How far did

15   he get in school on the outside?

16         INMATE DELUNA THROUGH INTERPRETER:  Fourth.

17         PRESIDING COMMISSIONER ANGELE:  Was that in

18   Mexico or here?

19         INMATE DELUNA THROUGH INTERPRETER:  Mexico.

20         PRESIDING COMMISSIONER ANGELE:  Have you

21   gone to any schooling while in prison?

22         INMATE DELUNA THROUGH INTERPRETER:  Yes, I

23   have gone.

24         PRESIDING COMMISSIONER ANGELE:  Do you have

25   any learning deficiencies or difficulties besides

26   the language?

27         INMATE DELUNA THROUGH INTERPRETER:

8

1    Difficulties to speak it, various words that I
2    can't get very well or understand them, but I try
3    to do the effort for it.
4         **PRESIDING COMMISSIONER ANGELE:**    Okay.    Does
5    he have any problems, educational wise, other than
6    language barriers?
7         **INMATE DELUNA THROUGH INTERPRETER:**    Part
8    language?
9         **PRESIDING COMMISSIONER ANGELE:**    Yes.
10        **INMATE DELUNA THROUGH INTERPRETER:**    Well,
11   English, that's a problem there to learn it.
12        **PRESIDING COMMISSIONER ANGELE:**    Do you
13   suffer from any disability that would prevent you
14   from participating in today's hearing?
15        **INMATE DELUNA THROUGH INTERPRETER:**    No.    No.
16        **PRESIDING COMMISSIONER ANGELE:**    This hearing
17   is being conducted pursuant to Penal Code Sections
18   3041 and 3042 and the rules and regulations of the
19   Board of Prison Terms governing parole
20   consideration hearings for life prisoners.    The
21   purpose of today's hearing is to consider your
22   suitability for parole.    In doing so, we're going
23   to consider the crimes you were committed for, your
24   prior criminal and social history, and your
25   behavior and your programming since your
26   commitment.    We've had the opportunity to review
27   your Central File and prior transcript, and you'll

1    have the opportunity to correct or clarify the

2    record.  Any change in parole plans should be

3    brought to our attention.  We're going to consider

4    your progress since your last hearing, any new

5    psychiatric reports, and any other information that

6    may have a bearing on your suitability for parole.

7    We're going to reach a decision today and inform

8    you whether or not we find you suitable and the

9    reasons for our decision.  If you are found

10   suitable, the length of your confinement will be

11   explained to you.  Now, this hearing is being

12   conducted by Court order from the Sixth Appellate

13   District from the California of Appeal in a

14   disposition (inaudible) 2005 of Santa Clara County,

15   Superior Court Number 101994, H number 027086.  The

16   instructions were to hold, to rehear and give the

17   inmate a new hearing based upon the results of his

18   last hearing which was March 27th, 2002.  Now, the

19   inmate does not have to discuss his offense with

20   us, and he does not have to admit his offense;

21   however, this Panel does accept as true the

22   findings of the Court.  Does he understand what

23   that means?

24       **INMATE DELUNA THROUGH INTERPRETER:**  I want

25   to understand it right.

26       **PRESIDING COMMISSIONER ANGELE:**  He wants to.

27       **INMATE DELUNA THROUGH INTERPRETER:**  I want

10

1   to understand it correctly.

2        **PRESIDING COMMISSIONER ANGELE:**  You pled

3   guilty in Court.

4        **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

5   Sir.

6        **PRESIDING COMMISSIONER ANGELE:**  That means

7   that we rely on the findings that he pled guilty.

8        **INMATE DELUNA THROUGH INTERPRETER:**  Yes.  I

9   pleaded guilty.

10       **PRESIDING COMMISSIONER ANGELE:**  All right.

11  Now, before we recess for deliberations, the

12  District Attorney, who is present by way of video

13  conference, the inmate's attorney, and the inmate

14  will have an opportunity to make a final statement

15  regarding parole suitability and the length of

16  confinement.  Once that is done, we'll recess,

17  clear the room, and deliberate.  When we have

18  completed our deliberations, we will resume the

19  hearing and announce our decision.  The California

20  Code of Regulations states that a life inmate

21  regardless of time served shall be found unsuitable

22  for and denied parole if in the opinion of this

23  Panel the inmate's release would pose an

24  unreasonable risk of danger to society or a threat

25  to public safety.  Now, the inmate has certain

26  rights.  Those rights include a timely notice of

27  this hearing, a right to review his Central File,

11

1    have an Olson Review, and the right to present

2    relevant documents.  Ms. Tardiff, have those rights

3    been met so far?

4        **ATTORNEY TARDIFF:**  Yes.

5        **PRESIDING COMMISSIONER ANGELE:**  An

6    additional right you have, Mr. DeLuna, is to be

7    heard by an impartial Panel.  Do you have any

8    objections to either member of this Panel?

9        **INMATE DELUNA THROUGH INTERPRETER:**  No.

10       **PRESIDING COMMISSIONER ANGELE:**  Counsel?

11       **ATTORNEY TARDIFF:**  No.

12       **PRESIDING COMMISSIONER ANGELE:**  You will

13   receive a copy of our written and tentative

14   decision today.  That decision becomes final within

15   120 days.  You will then receive a copy of the

16   decision and a copy of the transcript.  Are you

17   familiar with the change in your rights to appeal

18   Board decisions?

19       **INTERPRETER MORENO:**  How did you say that?

20       **PRESIDING COMMISSIONER ANGELE:**  Is he aware

21   of his right, the change in the regulations

22   regarding his rights to appeal Board decisions?

23       **INMATE DELUNA THROUGH INTERPRETER:**  Yes.

24       **PRESIDING COMMISSIONER ANGELE:**  He is aware.

25       **INMATE DELUNA THROUGH INTERPRETER:**  Yes.

26       **PRESIDING COMMISSIONER ANGELE:**  I want to

27   make sure, I'd better make sure he is.  Do you know

12

1    what a 1040 is, Form 1040?

2         INMATE DELUNA THROUGH INTERPRETER:   Yes.

3         PRESIDING COMMISSIONER ANGELE:   Okay.  So

4    you realize that you no longer can appeal to the

5    Board, you appeal directly to the Courts?

6         INMATE DELUNA THROUGH INTERPRETER:   Yes.

7         PRESIDING COMMISSIONER ANGELE:   I may have

8    already mentioned this to you, but you don't have

9    to discuss your offense with us, don't have to

10   admit your offense.  And once again, this Panel

11   does accept as true the findings of the Court.  Any

12   confidential material to be used today,

13   Commissioner Rodriguez?

14        DEPUTY COMMISSIONER RODRIGUEZ:   There will

15   be none used in today's hearing.

16        PRESIDING COMMISSIONER ANGELE:   I've passed

17   the Hearing Checklist marked Exhibit One to the

18   inmate's attorney to ensure that we all have the

19   same documents.  Mr. Rico, do you have the

20   documents as listed on the Hearing Checklist?

21        DEPUTY DISTRICT ATTORNEY RICO:   The lower

22   right corner says 3/17/05 (inaudible).

23        PRESIDING COMMISSIONER ANGELE:   Yes.

24        DEPUTY DISTRICT ATTORNEY RICO:   I have those

25   documents.

26        PRESIDING COMMISSIONER ANGELE:   Thank you.

27   Ms. Tardiff, do you have those documents?

13

1          **ATTORNEY TARDIFF:**  Yes, I do.

2          **PRESIDING COMMISSIONER ANGELE:**  Any

3    additional documents to be submitted?

4          **ATTORNEY TARDIFF:**  The interpreter has a

5    Spanish written only letter of support, and there

6    should be support letters in his file.  If not, he

7    has them.

8          **PRESIDING COMMISSIONER ANGELE:**  I have them

9    here.

10         **ATTORNEY TARDIFF:**  And other than that, no.

11         **PRESIDING COMMISSIONER ANGELE:**  All right.

12   Any preliminary objections?

13         **ATTORNEY TARDIFF:**  No.

14         **PRESIDING COMMISSIONER ANGELE:**  Will the

15   inmate be speaking to us today?

16         **ATTORNEY TARDIFF:**  Yes.

17         **PRESIDING COMMISSIONER ANGELE:**  Okay.  Mr.

18   DeLuna, raise your right hand as best you can so I

19   can swear you in.  Do you solemnly swear or affirm

20   that the testimony you give at today's hearing will

21   be the truth, the whole truth, and nothing but the

22   truth?

23         **INMATE DELUNA THROUGH INTERPRETER:**  Truth.

24         **PRESIDING COMMISSIONER ANGELE:**  If there's

25   no objections, Ms. Tardiff, I'd like to incorporate

26   by reference the Statement of Fact taken from the

27   March 2005 Board report pages one and two.

14

1          ATTORNEY TARDIFF:  No objection.

2          PRESIDING COMMISSIONER ANGELE:  Mr. DeLuna,

3   you are serving a life term for the murder of

4   Fernando Rentorio?

5          INMATE DELUNA THROUGH INTERPRETER:  Yes,

6   Sir.

7          PRESIDING COMMISSIONER ANGELE:  This

8   occurred on or about July the 7th of 1985.

9          INMATE DELUNA THROUGH INTERPRETER:  Yes,

10  Sir.

11         PRESIDING COMMISSIONER ANGELE:  And

12  apparently, you had been at the Rosarita's

13. Restaurant and Bar drinking.

14         INMATE DELUNA THROUGH INTERPRETER:  Yes,

15  Sir.

16         PRESIDING COMMISSIONER ANGELE:  With some

17  friends and with the victim.

18         INMATE DELUNA THROUGH INTERPRETER:  Yes,

19  Sir.

20         PRESIDING COMMISSIONER ANGELE:  Did you know

21  the victim very well?

22         INMATE DELUNA THROUGH INTERPRETER:  No, Sir.

23         PRESIDING COMMISSIONER ANGELE:  Not at all?

24         INMATE DELUNA THROUGH INTERPRETER:  It was

25  just something that just happened.  We didn't

26  really know each other well.

27         PRESIDING COMMISSIONER ANGELE:  Did he know

15

1    him at all?

2             INMATE DELUNA THROUGH INTERPRETER:  Oh, just

3    there, just there.

4             PRESIDING COMMISSIONER ANGELE:  Just that

5    night?

6             INMATE DELUNA THROUGH INTERPRETER:  Yes.

7    That same place that night.

8             PRESIDING COMMISSIONER ANGELE:  Apparently,

9    you were involved in a physical altercation.

10            INMATE DELUNA THROUGH INTERPRETER:  He's the

11   one that provoked.

12            PRESIDING COMMISSIONER ANGELE:  He struck

13   you.

14            INMATE DELUNA THROUGH INTERPRETER:  Yes.

15            PRESIDING COMMISSIONER ANGELE:  Okay.  You

16   left the bar.

17            INMATE DELUNA THROUGH INTERPRETER:  I left

18   the bar.

19            PRESIDING COMMISSIONER ANGELE:  Went home.

20            INMATE DELUNA THROUGH INTERPRETER:  And I

21   brought the rifle.

22            PRESIDING COMMISSIONER ANGELE:  The rifle.

23   Went back to the bar.

24            INMATE DELUNA THROUGH INTERPRETER:  And I

25   threw (inaudible) shots at him.

26            PRESIDING COMMISSIONER ANGELE:  Why did you

27   go back to the bar?

16

1    **INMATE DELUNA THROUGH INTERPRETER:**  Well,

2    the truth is that I was intoxicated.

3    **PRESIDING COMMISSIONER ANGELE:**  Okay.

4    **INMATE DELUNA THROUGH INTERPRETER:**  More, I

5    didn't have any other (inaudible) reaction that I

6    was intoxicated.  That's the whole truth.

7    **PRESIDING COMMISSIONER ANGELE:**  Now, you

8    state that you threw shots at him.  You fired the

9    rifle at him.

10    **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

11    Sir.

12    **PRESIDING COMMISSIONER ANGELE:**  And he tried

13    to run off.

14    **INMATE DELUNA THROUGH INTERPRETER:**  Yes.

15    **PRESIDING COMMISSIONER ANGELE:**  You followed

16    him.

17    **INMATE DELUNA THROUGH INTERPRETER:**  Yes.  I

18    was right there.

19    **PRESIDING COMMISSIONER ANGELE:**  But kind of

20    stalked him as he left.

21    **INMATE DELUNA THROUGH INTERPRETER:**  It was

22    right there, the same (inaudible) right around his

23    car.

24    **PRESIDING COMMISSIONER ANGELE:**  Okay.

25    **INMATE DELUNA THROUGH INTERPRETER:**  And I

26    went (inaudible), but the thing is that very many

27    years now, and I can't remember everything.

17

1          PRESIDING COMMISSIONER ANGELE:    I

2    understand.  But you did shoot him.

3          INMATE DELUNA THROUGH INTERPRETER:  Yes,

4    Sir.

5          PRESIDING COMMISSIONER ANGELE:  'You're

6    responsible.

7          INMATE DELUNA THROUGH INTERPRETER:  Yes.    I

8    am responsible.

9          PRESIDING COMMISSIONER ANGELE:    I want to

10   make sure that the record is clear that the

11   statement the inmate makes about throwing the

12   bullet at him means he pulled the trigger of a

13   rifle.

14         INMATE DELUNA THROUGH INTERPRETER:  Yes,

15   Sir.  I through the bullet thrower, shot the

16   bullets at him.

17         PRESIDING COMMISSIONER ANGELE:  The victim

18   was shot in the face apparently.

19         INMATE DELUNA THROUGH INTERPRETER:  Yes,

20   Sir.  I hit him in the face.

21         PRESIDING COMMISSIONER ANGELE:  But he

22   started walking across the parking lot.

23         INMATE DELUNA THROUGH INTERPRETER:  Yes,

24   Sir.

25         PRESIDING COMMISSIONER ANGELE:  And then you

26   shot him in the back.

27         INMATE DELUNA THROUGH INTERPRETER:  That's

18

1   (inaudible).  As he turned around, I hit him in the

2   back.

3       PRESIDING COMMISSIONER ANGELE:  Hit him in

4   the back means shot him in the back.

5       INMATE DELUNA THROUGH INTERPRETER:  That's

6   when he made the turn, turned around.

7       PRESIDING COMMISSIONER ANGELE:  I understand

8   that, but when the inmate refers to hitting him in

9   the back, he means shot him in the back.

10      INMATE DELUNA THROUGH INTERPRETER:  Well,

11  when he made the turn, that's when I hit him.

12  That's when I hit him.  I'm telling you the truth.

13  I hit him.

14      PRESIDING COMMISSIONER ANGELE:  Okay.  The

15  word hit means by bullet fired from the rifle.

16      INMATE DELUNA THROUGH INTERPRETER:  Yes.

17  Yes, I hit him with a bullet.

18      PRESIDING COMMISSIONER ANGELE:  Okay.  The

19  bullet was fired from the rifle.

20      INMATE DELUNA THROUGH INTERPRETER:  Yes.

21      PRESIDING COMMISSIONER ANGELE:  All right.

22  Thank you.  The reason why you got the rifle and

23  came back was because he had slapped or hit you?

24      INMATE DELUNA THROUGH INTERPRETER:  He had

25  hurt me and threatened to my life and he hit me.

26      PRESIDING COMMISSIONER ANGELE:  So you got

27  the rifle and came back.

19

1       INMATE DELUNA THROUGH INTERPRETER:  And he

2  told me he was going to kill me, and that's when I,

3  that's where I was wrong, and I went and got the

4  rifle.

5       PRESIDING COMMISSIONER ANGELE:  How far was

6  your house from where the bar is?

7       INMATE DELUNA THROUGH INTERPRETER:  Half a

8  mile, maybe less than half a mile, something like

9  that.

10       PRESIDING COMMISSIONER ANGELE:  Is this in

11  Morgan Hill?

12       INMATE DELUNA THROUGH INTERPRETER:  It's in

13  Morgan Hill.

14       PRESIDING COMMISSIONER ANGELE:  You couldn't

15  call the police?

16       INMATE DELUNA THROUGH INTERPRETER:  The

17  truth is I didn't have the reaction or the capacity

18  to do that.

19       PRESIDING COMMISSIONER ANGELE:  Because of

20  intoxication.

21       INMATE DELUNA THROUGH INTERPRETER:  Yes.

22  The reality is I was.

23       PRESIDING COMMISSIONER ANGELE:  Well, but he

24  wasn't drunk.  He wasn't so drunk that he couldn't

25  drive a car to his house, find his rifle, load it

26  or unload it, whatever it was, come back to the

27  bar, and shoot at somebody and hit him a couple

1  times.

2          INMATE DELUNA THROUGH INTERPRETER:   That's

3  what, that's my reason.   That's the truth because I

4  didn't have the reaction (inaudible) gentleman,

5  excuse me, please, pardon me, I've made my error.

6          PRESIDING COMMISSIONER ANGELE:   Okay.

7          INMATE DELUNA THROUGH INTERPRETER:   If you

8  don't want to believe me, what can I do?   I can't

9  do anything else.   I can't bring that man back.

10  Now, I would be first to be in his place than being

11  here with you talking.

12          PRESIDING COMMISSIONER ANGELE:   Okay.

13          INMATE DELUNA THROUGH INTERPRETER:

14  Gentlemen, what can I do.   If you want me to kiss

15  your feet, I'll kiss your feet, but pardon me, I

16  made an error.   I can't do anything.

17          PRESIDING COMMISSIONER ANGELE:   I think what

18  we need to do first of all is not describe shooting

19  another individual as (inaudible).   My question,

20  the question really was you're claiming you were

21  intoxicated, but yet, you were able to go home,

22  drive home, find the rifle, and drive back.   I'm

23  just trying to determine the level of your

24  intoxication.   Okay.   Now, you have no prior

25  arrests as a juvenile.

26          INMATE DELUNA THROUGH INTERPRETER:   No, Sir.

27          PRESIDING COMMISSIONER ANGELE:   You were

21

1    born on September 15th, 1954.

2         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

3    Sir.

4         **PRESIDING COMMISSIONER ANGELE:**  One of seven

5    children, born to Pablo DeLuna and Soledad

6    Fernandez.

7         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

8    Sir.

9         **PRESIDING COMMISSIONER ANGELE:**  And where

10   you born, Mr. DeLuna?

11        **INMATE DELUNA THROUGH INTERPRETER:**  In the

12   Colonia Modelo in Zacatecas.

13        **PRESIDING COMMISSIONER ANGELE:**  You're, at

14   the time, a legal alien steadily employed as a

15   field laborer until the instant offense.

16        **INMATE DELUNA THROUGH INTERPRETER:**  I was

17   legal.

18        **PRESIDING COMMISSIONER ANGELE:**  I said a

19   legal, legal alien employed as a field laborer.

20        **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

21   Sir.  I was legal.

22        **PRESIDING COMMISSIONER ANGELE:**  In 1979, the

23   inmate married Rosa DeLuna and has fathered two

24   children.

25        **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

26   Sir.

27        **PRESIDING COMMISSIONER ANGELE:**  And they

22

1    were divorced.

2            INMATE DELUNA THROUGH INTERPRETER:  Yes,

3    Sir.

4            PRESIDING COMMISSIONER ANGELE:   The inmate

5    is now married to Wanda Deluz DeLuna.

6            INMATE DELUNA THROUGH INTERPRETER:  Yes,

7    Sir.

8            PRESIDING COMMISSIONER ANGELE:   Is the

9    marriage still intact?

10           INMATE DELUNA THROUGH INTERPRETER:  Yes,

11   Sir.

12           PRESIDING COMMISSIONER ANGELE:   Do you have

13   any more than the two children?

14           INMATE DELUNA THROUGH INTERPRETER:   Well,

15   there is only one, a stepson.

16           PRESIDING COMMISSIONER ANGELE:   But with his

17   first wife, he has two children.

18           INMATE DELUNA THROUGH INTERPRETER:   The

19   other one just had one daughter.

20           ATTORNEY TARDIFF:   I don't think he has any

21   children.  Do you have any children?

22           INMATE DELUNA THROUGH INTERPRETER:   With

23   her, I just have stepchildren.

24           PRESIDING COMMISSIONER ANGELE:   Okay.  I

25   want to make sure we get this totally clear because

26   the report says he fathered two children.  Is he

27   the biological father of any children?

23

1          INMATE DELUNA THROUGH INTERPRETER:  I am

2     grandfather to the first children.

3          PRESIDING COMMISSIONER ANGELE:  Okay.

4          INMATE DELUNA THROUGH INTERPRETER:  That's

5     what I was with the wife, DeLuna, Rosa DeLuna.

6          PRESIDING COMMISSIONER ANGELE:  In regards

7     to substance abuse, you first started using alcohol

8     about the age of 17.

9          INMATE DELUNA THROUGH INTERPRETER:  Yes,

10    Sir.

11         PRESIDING COMMISSIONER ANGELE:  Denies the

12    use of any illicit drug.

13         INMATE DELUNA THROUGH INTERPRETER:  That's

14    the truth.  I have never used that.

15     ·    PRESIDING COMMISSIONER ANGELE:  Okay.  Drank

16    maybe one or two beers everyday?

17         INMATE DELUNA THROUGH INTERPRETER:  Yes,

18    Sir.

19         PRESIDING COMMISSIONER ANGELE:  On the

20    weekends, maybe a six-pack.

21         INMATE DELUNA THROUGH INTERPRETER:  Yes,

22    Sir.

23         PRESIDING COMMISSIONER ANGELE:  But

24    apparently that on the day this happened, he

25    consumed a very large quantity of alcohol.

26         INMATE DELUNA THROUGH INTERPRETER:  Yes,

27    Sir.

24

1          PRESIDING COMMISSIONER ANGELE: Was it all

2   beer?

3          INMATE DELUNA THROUGH INTERPRETER:  It was

4   beer.

5          PRESIDING COMMISSIONER ANGELE:  Where do you

6   plan to live if you're released, Mr. DeLuna?

7          INMATE DELUNA THROUGH INTERPRETER:  In

8   Colonia Modelo in Zacatecas with my parents.

9          PRESIDING COMMISSIONER ANGELE:  He wants to

10  go back to Mexico.

11         INMATE DELUNA THROUGH INTERPRETER:  I'll go

12  back to Mexico.

13         PRESIDING COMMISSIONER ANGELE:  We do have

14  some letters in the file.  The first one is from

15  Joseph Eiello, E-I-E-L-L-O.

16         INMATE DELUNA THROUGH INTERPRETER:  Yes,

17  Sir.

18         PRESIDING COMMISSIONER ANGELE:  He is

19  president of Uesugi Farms.

20         INMATE DELUNA THROUGH INTERPRETER:  Uesugi

21  Farms.

22         PRESIDING COMMISSIONER ANGELE:  That's

23  U-E-S-U-G-I, Farms.  That's located in Gilroy.

24         INMATE DELUNA THROUGH INTERPRETER:  Gilroy,

25  yes.

26         PRESIDING COMMISSIONER ANGELE:  Writing on

27  behalf of the inmate.  Apparently, the inmate had

1    worked for this company about six years.

2        INMATE DELUNA THROUGH INTERPRETER:  Yes.

3    Yes, Sir.

4        PRESIDING COMMISSIONER ANGELE:  It refers to

5    him as a good worker.

6        INMATE DELUNA THROUGH INTERPRETER:  Yes,

7    Sir.

8        PRESIDING COMMISSIONER ANGELE:  And this is

9    an offer for employment and also an offer for you

10   to live on the premises in farm worker housing.

11   The next is from is it Erma DeLuna?  This is your

12   sister-in-law?

13       INMATE DELUNA THROUGH INTERPRETER:  That's

14   my sister-in-law.

15       PRESIDING COMMISSIONER ANGELE:  She resides

16   in Minnesota.

17       INMATE DELUNA THROUGH INTERPRETER:  Yes,

18   Sir.

19       PRESIDING COMMISSIONER ANGELE:  Ready and

20   willing and able to support you in any way she can

21   whether that be financially, emotionally, or

22   spiritually.  It says the entire family's willing

23   to assist you in any way necessary.  This is from,

24   apparently, your brother, Debrado DeLuna.

25       INMATE DELUNA THROUGH INTERPRETER:  Yes,

26   Sir.

27       PRESIDING COMMISSIONER ANGELE:  Who is the

26

1   husband of Erma.

2           **INMATE DELUNA THROUGH INTERPRETER:**   Yes,

3   Sir.

4           **PRESIDING COMMISSIONER ANGELE:**   The letter

5   says the same thing, willing and able to support

6   you in any way they can.

7           **INMATE DELUNA THROUGH INTERPRETER:**   Yes,

8   Sir.

9           **PRESIDING COMMISSIONER ANGELE:**   Were there

10  any other letters?

11          **INTERPRETER MORENO:**   There's one other

12  letter here, Sir.

13          **PRESIDING COMMISSIONER ANGELE:**   The one in

14  Spanish?

15          **INTERPRETER MORENO:**   In Spanish.

16          **PRESIDING COMMISSIONER ANGELE:**   What is in

17  it basically as if it is an offer of employment,

18  offer of residence?

19          **INTERPRETER MORENO:**   No.   It is not an offer

20  of employment.   It's from his present wife, Wanda

21  DeLuna.

22          **PRESIDING COMMISSIONER ANGELE:**   All right.

23          **INTERPRETER MORENO:**   It's basically a letter

24  of support.

25          **PRESIDING COMMISSIONER ANGELE:**   Paraphrase

26  for us if you wouldn't mind.

27          **INTERPRETER MORENO:**   Okay.   If I may, it

1    says,

2         "To whom It May Concern.  My name is

3         Wanda DeLuna.  I am writing this to

4         ask in the name of God for the, for

5         justice, and I ask for your pardon

6         for my husband, Isidoro DeLuna, a

7         prisoner since 1985.  Let's see,

8         correctional in Soledad.  I ask that,

9         please, it's been a long time since

10        the decision to grant him his

11        liberty.  He is my husband, and he

12        deserves.  He is a good person,

13        generous, amiable, a good worker, and

14        very responsible.  I love him very

15        much, and I need at home as a

16        companion and his support.  He needs

17        to be with his family.  He has been

18        ill with three surgeries to this

19        moment, and he continues under

20        medical treatment.  Please, hear me,

21        I beg you.  Permit him his liberty.

22        I wait for you to hear me for your

23        representation (inaudible) of

24        justice.  Sincerely (indiscernible)

25        Wanda DeLuna."

26        **PRESIDING COMMISSIONER ANGELE:**  Where does

27   your wife, where does his wife live now?

28

1       INTERPRETER MORENO:  According to the, it's

2  18 Buffalo (inaudible).

3       PRESIDING COMMISSIONER ANGELE:  What is the

4  city?

5       INTERPRETER MORENO:  American Canyon,

6  California.

7       PRESIDING COMMISSIONER ANGELE:  All right.

8  The only question I have, the inmate, does he plan

9  to go back to Mexico, and if he does, does his wife

10  plan to go with him?

11       INMATE DELUNA THROUGH INTERPRETER:  She's

12  there from that ranch, from the same ranch.  That

13  I'm sure she'll go over there.

14       ATTORNEY TARDIFF:  There's some other

15  letters here apparently.  Let me give you that.

16  They're mainly --

17       PRESIDING COMMISSIONER ANGELE:  Thank you,

18  counsel.  This is a letter from Felizio Fernandez.

19  It's from Minneapolis, Minnesota also.  This is an

20  uncle?

21       INMATE DELUNA THROUGH INTERPRETER:  That's

22  my uncle.

23       PRESIDING COMMISSIONER ANGELE:  He and his

24  wife would be willing to provide the inmate with a

25  place to live, food, clothing, it says, until such

26  time that he can find some fulltime employment and

27  be self-supporting.  Alberto and Rita DeLuna, this

29

1   ·is a brother.

2          INMATE DELUNA THROUGH INTERPRETER:   My

3   brother.

4          PRESIDING COMMISSIONER ANGELE:   He's in

5   Minnesota also.   Is your whole family in Minnesota?

6          INMATE DELUNA THROUGH INTERPRETER:   Yes,

7   Sir.   They're all there.   Their telephone numbers

8   are there also.

9          PRESIDING COMMISSIONER ANGELE:   This is a

10  letter that said he will provide you with a place

11  to live, food, clothing.   He will assist you in

12  finding employment.

13         INMATE DELUNA THROUGH INTERPRETER:   Yes,

14  Sir.

15         PRESIDING COMMISSIONER ANGELE:   This is from

16  Tiadoro DeLuna, it's a brother.

17         INMATE DELUNA THROUGH INTERPRETER:   A

18  brother.

19         PRESIDING COMMISSIONER ANGELE:   Takes full

20  responsibility for your financial support.   He is

21  in Minnesota also.   And Nadi DeLuna, brother.

22         INMATE DELUNA THROUGH INTERPRETER:   An aunt.

23  My brother also, yes.

24         PRESIDING COMMISSIONER ANGELE:   He resides

25  in Minneapolis.

26         INMATE DELUNA THROUGH INTERPRETER:   Yes,

27  Sir.   He also lives there.

30

1    PRESIDING COMMISSIONER ANGELE:  Will provide

2    you with a place to live, food, clothing until such

3    time as you can find full employment.  Fernando

4    DeLuna, a brother.

5    INMATE DELUNA THROUGH INTERPRETER:  My

6    brother.

7    PRESIDING COMMISSIONER ANGELE:  Minnesota.

8    Willing to provide you with a place to live, food,

9    clothing until such time as you can find full

10   employment, plus his wife would be responsible for

11   your day to day security, and even though you've

12   been convicted of a serious crime, certainly, you

13   do not represent any future threat to either his

14   family or the citizens of the State of Minnesota.

15   Mr. and Mrs. Nicholas DeLuna, this is your brother.

16   INMATE DELUNA THROUGH INTERPRETER:  It's my

17   brother, yes, Sir.

18   PRESIDING COMMISSIONER ANGELE:  In

19   Minneapolis also, and the same thing, food,

20   clothing, a place to live until you find full

21   employment.  Leonardo and Maria DeLuna, it doesn't

22   say.  This is your brother also?

23   INMATE DELUNA THROUGH INTERPRETER:  Who?

24   PRESIDING COMMISSIONER ANGELE:  Leonardo?

25   INMATE DELUNA THROUGH INTERPRETER:  Leonardo

26   is my brother also.

27   PRESIDING COMMISSIONER ANGELE:  They also

1    live in Minnesota.

2         INMATE DELUNA THROUGH INTERPRETER:  Yes.

3    They also live there.

4         PRESIDING COMMISSIONER ANGELE:  And he said

5    that they'll provide you (inaudible) support the

6    inmate in the United States or in Mexico.

7         INMATE DELUNA THROUGH INTERPRETER:  Yes,

8    Sir.

9         PRESIDING COMMISSIONER ANGELE:  All right.

10   This is a nephew.

11        INMATE DELUNA THROUGH INTERPRETER:  He is my

12   nephew.

13        PRESIDING COMMISSIONER ANGELE:  They

14   indicate that you'll be no problem financially in

15   relation for them to support you.  Here's a letter

16   from Debrado.

17        INMATE DELUNA THROUGH INTERPRETER:  My

18   brother.

19        PRESIDING COMMISSIONER ANGELE:  I think we

20   already read this one maybe.

21        ATTORNEY TARDIFF:  I think so.

22        PRESIDING COMMISSIONER ANGELE:  Food,

23   shelter, clothing, the inmate could be a productive

24   member of society.  These are all from the same

25   individual.  Yes.  We've read this one.  Okay.

26   We've read these other ones.  This is from Debrado

27   and Erma.  Anything else?  Have we read all the

1   letters, covered all the letters?

2          INMATE DELUNA THROUGH INTERPRETER:  Yes.

3          PRESIDING COMMISSIONER ANGELE:  Most of your

4   support seems to be in Minnesota.

5          INMATE DELUNA THROUGH INTERPRETER:  All the

6   family is there.  Just my wife is here in

7   California.

8          PRESIDING COMMISSIONER ANGELE:  Is he aware

9   that he could serve his prison sentence in

10   Minnesota?

11          INMATE DELUNA THROUGH INTERPRETER:  No.  I

12   would go to Mexico.

13          PRESIDING COMMISSIONER ANGELE:  No.  His

14   prison sentence.  Instead of being in prison in

15   California, he could go to Minnesota to serve his

16   prison sentence.

17          INMATE DELUNA THROUGH INTERPRETER:  No.  I

18   don't think you could send me over there.

19          PRESIDING COMMISSIONER ANGELE:  I got to get

20   this through.  We're not going to send, but he

21   could apply if he wanted to.

22          INMATE DELUNA THROUGH INTERPRETER:  No, Sir.

23          PRESIDING COMMISSIONER ANGELE:  Okay.

24          DEPUTY COMMISSIONER RODRIGUEZ:  Nobody wants

25   to go to Minnesota.

26          PRESIDING COMMISSIONER ANGELE:  You don't

27   have a hold on you.

33

1          **DEPUTY COMMISSIONER RODRIGUEZ:**  He does have

2     an INS Hold.

3          **ATTORNEY TARDIFF:**  Yeah.  He has one.

4          **PRESIDING COMMISSIONER ANGELE:**  I don't

5     think I saw one.

6          **INMATE DELUNA THROUGH INTERPRETER:**  I think

7     I do have one.

8          **DEPUTY COMMISSIONER RODRIGUEZ:**  He does.  I

9     verified it.

10          **PRESIDING COMMISSIONER ANGELE:**  Well, in

11     that case, you probably will be going back to

12     Mexico.

13          **INMATE DELUNA THROUGH INTERPRETER:**  Yes.

14     I'll go to Mexico.

15          **ATTORNEY TARDIFF:**  But what he means is if

16     you wanted to be closer to your family, you could

17     go to Minnesota in the meantime and serve your time

18     there.

19          **INMATE DELUNA THROUGH INTERPRETER:**  No.

20          **PRESIDING COMMISSIONER ANGELE:**  Okay.  All

21     right.  We sent out what we call 3042 Notices, and

22     those are notices that go out to agencies that have

23     a direct interest in your case such as police

24     department, sheriff department, District Attorney,

25     Judge, things of that nature.  I have not received

26     any replies; however, there is a representative

27     here today present via video conference from the

34

1    Santa Clara County District Attorney's Office, who,
2    I'm sure, will make a statement regarding parole
3    suitability prior to the conclusion of this
4    hearing.  And with that, we'll go to post-
5    conviction factors, please, Commissioner Rodriguez.

6         **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Good
7    afternoon, Mr. DeLuna.

8         **INMATE DELUNA THROUGH INTERPRETER:**  Good
9    afternoon.

10        **DEPUTY COMMISSIONER RODRIGUEZ:**  During this
11   portion of the hearing, I'll be addressing what
12   you've done since your last Board appearance which
13   will then bring us to the present.  If there's
14   anything that I, excuse me.  In preparation for
15   this I've reviewed your Central File.  If there's
16   anything out, if there's anything that I leave out
17   during this reading, either you or your attorney
18   can address it.  Okay.  Your last Board appearance
19   was held at Soledad State Prison on March 27, 2002.
20   You were given a three-year denial, and the Board
21   recommended remain disciplinary-free, upgrade
22   vocationally and educationally.

23        **INMATE DELUNA THROUGH INTERPRETER:**  Yes,
24   Sir.

25        **DEPUTY COMMISSIONER RODRIGUEZ:**  All right.
26   He doesn't have to answer yet.

27        **INMATE DELUNA THROUGH INTERPRETER:**  Excuse

1    me.

2           DEPUTY COMMISSIONER RODRIGUEZ:    And to

3    participate in self-help and therapy.    He

4    transferred here to California Men's Colony East

5    Facility on May 20th, 2004, due to a need for

6    medical surgery, and he's currently here due to

7    some outstanding appointments, medical

8    appointments, and will eventually return back to

9    Soledad.    So therefore, he's currently medically

10   unassigned.    His current placement score is 19

11   points consistent with a Level Two inmate, and 19

12   points is the lowest points a life inmate can get.

13   He's currently in Level Three institution on a

14   medical override.    One moment, please.    I'm turning

15   the tapes over.

16           [Thereupon, the tape was turned over.]

17           DEPUTY COMMISSIONER RODRIGUEZ:    Side two,

18   we're back on record.    Mr. DeLuna, you have an

19   active Immigration Hold.    Your current custody is

20   Medium A.    As I stated, you're currently medically

21   unassigned.    Your previous employment, or your

22   previous position was a porter with average

23   reports, work reports.    You have attended some ESL,

24   English as a Second Language classes.    You have not

25   received your GED.    You have not received a

26   vocation yet, but you have received two

27   certificates of achievement for vocational

36

1    landscape and have satisfactory work performance.

2    You have, you have completed the Impact Program.

3    That's in July of 2000. You have attended AA,

4    Alcoholics Anonymous. Mr. DeLuna, do you attend

5    any classes here at CMC?

6        **INMATE DELUNA THROUGH INTERPRETER:** I have

7    one, and I attended, and the other one I didn't

8    attend.

9        **DEPUTY COMMISSIONER RODRIGUEZ:** Okay. You

10   have attended Personal Growth Seminars and

11   completed a 44-week course. You also have attended

12   a self-esteem program. In reviewing a chrono in

13   your file dated January 29th, 2003, this is from

14   Soledad, it says you continue to voluntarily

15   participate in Project Change.

16       **INMATE DELUNA THROUGH INTERPRETER:** Yes,

17   Sir.

18       **DEPUTY COMMISSIONER RODRIGUEZ:** And this is

19   the 44-week course I addressed. It deals with

20   self-esteem, assertiveness, goal setting, Anger

21   Management, coping skills, stress reduction and

22   tolerance, parenting, domestic violence, and life

23   skills, and you're to be commended for that. You

24   have never received any serious or administrative

25   CDC 115s. You have received --

26       **INMATE DELUNA THROUGH INTERPRETER:** No, Sir.

27   I've received that.

37

1          **ATTORNEY TARDIFF:**  He said that.

2          **DEPUTY COMMISSIONER RODRIGUEZ:**  Right.  But

3  you have received two counseling chronos, and the

4  last one was in April 25th, 2004, for delaying

5  lockup.

6          **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

7  Sir.

8          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Does

9  everything I've read appear correct to you?

10          **INMATE DELUNA THROUGH INTERPRETER:**  Well,

11  for me, it's correct.

12          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.

13          **INMATE DELUNA THROUGH INTERPRETER:**  It's

14  just the 128s, it could be that I may not be

15  correct.  May I explain to you?

16          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Yes.

17  In fact, it's, here's two of them.  Okay.  One you

18  received for in May 2nd, 1998, for grooming

19  standards.  It must have been your mustache.

20  Right?  Okay.  And then the last one I just read is

21  for delaying lockup.

22          **INMATE DELUNA THROUGH INTERPRETER:**  Okay.

23  May I think about that one?

24          **DEPUTY COMMISSIONER RODRIGUEZ:**  Yes.  Go

25  ahead.

26          **INMATE DELUNA THROUGH INTERPRETER:**  On the

27  28th they gave it to me, when they sent us to eat,

38

1  and the program is (inaudible) I went to have my

2  hair cut, from there I returned to the unit,

3  (inaudible) when they were getting ready to close

4  the door, and they gave me that, but I didn't have

5  much, put much importance to that 128.

6  **DEPUTY COMMISSIONER RODRIGUEZ:**  It's still

7  an infraction.  It's not serious, but it basically

8  he was a little bit late.  Okay.

9  **INMATE DELUNA THROUGH INTERPRETER:**  Okay.

10  **DEPUTY COMMISSIONER RODRIGUEZ:**  I'm going to

11  the psych report, and this is a four-page report.

12  I'm not going to read the report in its entirety.

13  It is authored by Eric Rueschenberg,

14  R-U-E-S-C-H-E-N-B-E-R-G, Clinical Psychologist.

15  The date of this report is, the interview was

16  conducted on 7/27/2001, utilizing a Spanish

17  interpreter, and it as I stated, it was completed

18  here at California Men's Colony East Facility.

19  **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

20  Sir.

21  **DEPUTY COMMISSIONER RODRIGUEZ:**  Going to

22  page two under substance abuse history, Mr. DeLuna

23  reported that he first started using alcohol at the

24  age of 17.  He denied any use of illicit drugs.

25  Initially, he informed the examiner that he

26  consumed approximately one or two beers everyday

27  and perhaps a six-pack on weekends.  However, as

39

1   the interview progressed, it became apparent that

2   his use of alcohol was likely more extensive.  It

3   appears that on the day of the index offense, he

4   consumed a large quantity of alcohol.  Currently,

5   Mr. DeLuna denies having a problem with alcohol.

6   Under clinical assessment, he, which is Mr. DeLuna,

7   was alert and well oriented in the three spheres.

8   His speech was heavily accented, but he was able to

9   communicate effectively with the assistance of an

10   interpreter.  Under diagnostic impressions, Axis I,

11   Alcohol Dependence in Full Remission in a

12   Controlled Setting, Adult Antisocial Behavior; Axis

13   II, Deferred; Axis III, Recent Surgery on Hernia;

14   Axis IV, Incarceration; Axis V, Global Assessment

15   of Functioning, it's 73.  I don't recall if

16   Commissioner Angele asked him, is he discussing the

17   case or not?

18          **ATTORNEY TARDIFF:**  He is.

19          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  I

20   just had a quick question.  Under criminal history,

21   it says allegedly he got up walked around, which is

22   the victim, to the other side of the car and began

23   yelling at Mr. DeLuna, go ahead and kill me.

24   Another shot was fired striking the victim in the

25   face, and the victim continued to walk around his

26   car spitting blood and fragments of teeth.  Mr.

27   DeLuna, you had already shot him.  After he was hit

40

1    and walking around toward you, why did you shoot
2    him again in the face when he was helpless?
3              INMATE DELUNA THROUGH INTERPRETER:    Well,
4    Sir, the truth is that I was blind because of the
5    alcohol.   The alcohol now is --
6              DEPUTY COMMISSIONER RODRIGUEZ:   Are you an
7    alcoholic?
8              INMATE DELUNA THROUGH INTERPRETER:   Yes,
9    Sir.   I'm a drunk.
10             DEPUTY COMMISSIONER RODRIGUEZ:   Fourth
11   paragraph, in the present interview, Mr. DeLuna
12   acknowledged full responsibility of shooting and
13   killing the victim.   Mr. DeLuna had previously
14   reported that he had limited recollection of the
15   offense since he was heavily inebriated when the
16   crime occurred.   Does he recall shooting the victim
17   when he walked across a stack of wooden boxes?
18             INMATE DELUNA THROUGH INTERPRETER:   Parts
19   that I don't remember very well.
20             DEPUTY COMMISSIONER RODRIGUEZ:   Okay.   But
21   you remember shooting him?
22             INMATE DELUNA THROUGH INTERPRETER:   I know I
23   did the bad thing.
24             DEPUTY COMMISSIONER RODRIGUEZ:   Okay.   Did
25   he, the victim, did he (inaudible) buy the victim a
26   beer earlier in the club?
27             INMATE DELUNA THROUGH INTERPRETER:   I

41

1    invited him to a beer.

2          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.

3          **INMATE DELUNA THROUGH INTERPRETER:**   I

4    invited him to but he didn't want it.

5          **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  And

6    the reason I'm saying, he stated here that he

7    reported that he and his brother and a friend

8    decided to leave the restaurant.  No.  Excuse me.

9    I'm sorry.  That he ordered, excuse me, Mr. DeLuna

10   ordered four beers for the four individuals sitting

11   at the other table.

12         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

13   Sir.

14         **DEPUTY COMMISSIONER RODRIGUEZ:**  Was the

15   victim one of the four individuals?

16         **INMATE DELUNA THROUGH INTERPRETER:**  Yes.

17   Yes, he was one.

18         **DEPUTY COMMISSIONER RODRIGUEZ:**  Thank you.

19   The next page it says, Mr. DeLuna acknowledged that

20   he never saw the victim with a firearm.  When

21   questioned about why he continued to shoot the

22   victim who was no longer posing a threat to him,

23   his only response was I was feeling scared.  He

24   expressed remorse for the offense.  Under risk for

25   violence, it should be noted that since Mr. DeLuna

26   is from a different cultural background, these

27   instruments have questionable validity.  On all

```
 1    three measures Mr. DeLuna scored well within the
 2    low range of severity; however, as mentioned above,
 3    these results need to be interpreted cautiously
 4    since these instruments have questionable validity
 5    for individuals from different cultures.
 6    Conclusion, overall, Mr. DeLuna appears to have a
 7    low level of risk for future violence in the
 8    community.  The index offense seems to be an
 9    isolated incident related to tense situational
10    factors and the disinhibiting effects of alcohol
11    intoxication.  However, it should be noted that Mr.
12    DeLuna appears to have had a more serious problem
13    with alcohol than he is acknowledging.  And I do
14    want to say, this report was written in 2001.
15    Today, Mr. DeLuna admits that he is an alcoholic
16    and a drunk; is that correct?
17              INMATE DELUNA:  That is correct.
18              INTERPRETER MORENO:  That's correct.
19              DEPUTY COMMISSIONER RODRIGUEZ:  If Mr.
20    DeLuna is to remain in prison, it is recommended
21    that he continue to remain disciplinary-free and
22    that he improve his English skills and that he
23    participate in Alcoholics Anonymous.  At this time,
24    I return it to the Chair.
25              PRESIDING COMMISSIONER ANGELE:  Thank you.
26    Mr. DeLuna, have you had anything to drink since
27    you've come to prison?
```

43

1          **INMATE DELUNA THROUGH INTERPRETER:**  No, Sir.

2          **PRESIDING COMMISSIONER ANGELE:**  Any

3     questions, Commissioner Rodriguez?

4          **DEPUTY COMMISSIONER RODRIGUEZ:**  No further

5     questions.

6          **PRESIDING COMMISSIONER ANGELE:**  Any

7     questions from the District Attorney?

8          **DEPUTY DISTRICT ATTORNEY RICO:**  Yes.

9     Commissioner, and for Mr. DeLuna's benefit I'll

10    address them to the Chair.  On the day of the life

11    crime, had Mr. DeLuna been drinking before he went

12    to Rosarita's Restaurant Bar?

13         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

14    Sir.

15         **DEPUTY DISTRICT ATTORNEY RICO:**  Could he

16    explain a little bit about that?

17         **INMATE DELUNA THROUGH INTERPRETER:**  Since

18    12:00 p.m. or 1:00 p.m. more or less.

19         **PRESIDING COMMISSIONER ANGELE:**  Where had he

20    been drinking?

21         **INMATE DELUNA THROUGH INTERPRETER:**  I was

22    working, gentlemen.

23         **PRESIDING COMMISSIONER ANGELE:**  Was this

24    during the day?

25         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

26    that was during the day that I was drinking

27    working.

44

1          PRESIDING COMMISSIONER ANGELE:  Afternoon or

2     morning?

3          INMATE DELUNA THROUGH INTERPRETER:  In the

4     morning.

5          PRESIDING COMMISSIONER ANGELE:  In the

6     morning.

7          INMATE DELUNA THROUGH INTERPRETER:  In the

8     morning.

9          DEPUTY DISTRICT ATTORNEY RICO:  And that was

10    at work he was drinking?

11         INMATE DELUNA THROUGH INTERPRETER:  Yes,

12    Sir.  I was drinking because the day was hot.

13         DEPUTY DISTRICT ATTORNEY RICO:  Okay.  And

14    drinking alcohol?

15         INMATE DELUNA THROUGH INTERPRETER:  A little

16    (inaudible) that's what it was.  We were drinking

17    beer.  Yes, Sir.

18         DEPUTY DISTRICT ATTORNEY RICO:  And after

19    work, did Mr. DeLuna continue drinking before going

20    to Rosarita's Bar?

21         INMATE DELUNA THROUGH INTERPRETER:  Yes,

22    Sir, I continued.

23         DEPUTY DISTRICT ATTORNEY RICO:  Where was

24    that?

25         INMATE DELUNA THROUGH INTERPRETER:  I bought

26    it at the liquor store, and I was drinking it in my

27    house.

45

1        **DEPUTY DISTRICT ATTORNEY RICO:**  And was he

2    alone, or was somebody (inaudible)?

3        **INMATE DELUNA THROUGH INTERPRETER:**  No.  I

4    had company.

5        **DEPUTY DISTRICT ATTORNEY RICO:**  And why is

6    it that Mr. DeLuna decided to leave home where he

7    had been drinking and go out to the bar?

8        **INMATE DELUNA THROUGH INTERPRETER:**  Sir,

9    because when I went to the bar, I had gone out to

10   buy some shoes at the flea market.

11       **DEPUTY DISTRICT ATTORNEY RICO:**  Did Mr.

12   DeLuna drink at the flea market?

13       **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

14   Sir.  I drank there.

15       **DEPUTY DISTRICT ATTORNEY RICO:**  And who was

16   he at the flea market with?

17       **INMATE DELUNA THROUGH INTERPRETER:**  With a

18   friend.

19       **DEPUTY DISTRICT ATTORNEY RICO:**  And was it

20   after the flea market that he went to Rosarita's?

21       **INMATE DELUNA THROUGH INTERPRETER:**  It was a

22   brother of mine with me.

23       **DEPUTY DISTRICT ATTORNEY RICO:**  I guess I

24   didn't quite understand that.  What was that?

25       **INMATE DELUNA THROUGH INTERPRETER:**  At the

26   flea market, we were drinking with a friend and my

27   brother.

46

1        **DEPUTY DISTRICT ATTORNEY RICO:**   Okay.   And

2   which brother was that?

3        **INMATE DELUNA THROUGH INTERPRETER:**   My

4   brother, Marrelio.

5        **DEPUTY DISTRICT ATTORNEY RICO:**   Okay.   And

6   then at some point, Mr. DeLuna and his friend and

7   his brother, Marrelio went to Rosarita's; is that

8   correct?

9        **INMATE DELUNA THROUGH INTERPRETER:**   One went

10  to his house and my brother and I went to the

11  restaurant, Rosarita's.

12       **DEPUTY DISTRICT ATTORNEY RICO:**   Okay.   And

13  then the drinking continued at Rosarita's?

14       **INMATE DELUNA THROUGH INTERPRETER:**   Yes,

15  Sir.

16       **DEPUTY DISTRICT ATTORNEY RICO:**   Okay.   And

17  that's when this incident came, well, let me ask

18  this.   The problem with the victim and his friends,

19  did it come up over Mr. DeLuna being intoxicated

20  and drinking and singing in a loud voice?

21       **INMATE DELUNA THROUGH INTERPRETER:**

22  Gentleman, sir, I was drinking.   I was eating some

23  tortillas, and (inaudible) got there started, you

24  know, threatening me at my back.

25       **DEPUTY DISTRICT ATTORNEY RICO:**   Okay.   Did

26  they complain about Mr. DeLuna's singing n the bar?

27       **INMATE DELUNA THROUGH INTERPRETER:**   The

1  gentleman was the one who complained about it.  I

2  wasn't singing.  I went there to, I went there to

3  play the piano.

4         **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.

5  Anyway, how did Mr. DeLuna get from the flea market

6  to the bar?

7         **INMATE DELUNA THROUGH INTERPRETER:**  Well,

8  they're close.

9         **DEPUTY DISTRICT ATTORNEY RICO:**  Did he walk

10  or drive?

11         **INMATE DELUNA THROUGH INTERPRETER:**  No.  We

12  drove, drove.

13         **DEPUTY DISTRICT ATTORNEY RICO:**  And when you

14  say, we drove, who drove?

15         **INMATE DELUNA THROUGH INTERPRETER:**  I drove

16  myself.

17         **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.  But

18  his brother Marrelio was in the car?

19         **INMATE DELUNA THROUGH INTERPRETER:**  He was

20  with me, but he was in the restaurant.

21         **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.  So

22  after there was this disagreement with the victim

23  and his friends, did Mr. DeLuna go out to his car

24  and drive home?

25         **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

26  Sir.

27         **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.  And

48

1   what about his brother?

2          INMATE DELUNA THROUGH INTERPRETER:   My

3   brother stayed at home.

4          DEPUTY DISTRICT ATTORNEY RICO:   I don't

5   quite understand.   Let me re-ask it so there's no

6   confusion.   Mr. DeLuna and his brother were at the

7   bar, and then I assume Mr. DeLuna drove his brother

8   back to the house?

9          INMATE DELUNA THROUGH INTERPRETER:   Yes,

10  Sir.

11          DEPUTY DISTRICT ATTORNEY RICO:   Okay.   Now,

12  I note in one of these reports, in the psych report

13  at page four, it says something about Mr. DeLuna

14  had a rifle in the car; is that right?

15          INMATE DELUNA THROUGH INTERPRETER:   Yes,

16  Sir.

17          DEPUTY DISTRICT ATTORNEY RICO:   Was the

18  rifle obtained at the house or was it already in

19  the car?

20          INMATE DELUNA THROUGH INTERPRETER:   It was

21  in the car.

22          DEPUTY DISTRICT ATTORNEY RICO:   Okay.   So

23  why go home?

24          INMATE DELUNA THROUGH INTERPRETER:   Because

25  I had that car.   I had a heavy truck with me.

26          DEPUTY DISTRICT ATTORNEY RICO:   You were at

27  the bar in the truck.

49

1          INMATE DELUNA THROUGH INTERPRETER:  Yes,

2   Sir.

3          DEPUTY DISTRICT ATTORNEY RICO:  Okay.  So

4   you drove the truck with your brother in it home.

5          INMATE DELUNA THROUGH INTERPRETER:  Yeah.

6          DEPUTY DISTRICT ATTORNEY RICO:  And it was

7   at home that you had a car with a rifle in it.

8          INMATE DELUNA THROUGH INTERPRETER:  Yes,

9   Sir.  Yes, Sir.

10         DEPUTY DISTRICT ATTORNEY RICO:  Why did you

11  have a rifle in your car?

12         INMATE DELUNA THROUGH INTERPRETER:  Well,

13  the reality is that it was for protection at home,

14  but I never thought that it was going to get to

15  this to (inaudible) at home.  I had never had that

16  in my mind.  The truth is is that I was a very

17  innocent person in that form.

18         DEPUTY DISTRICT ATTORNEY RICO:  But I don't

19  quite understand.  Why keep the rifle in the car?

20         INMATE DELUNA THROUGH INTERPRETER:  I had it

21  there because I worked, and I would take it to

22  scare the birds when the napa is growing.  They

23  have a picture here of the lettuce that it gives in

24  the letter.

25         DEPUTY DISTRICT ATTORNEY RICO:  I guess I

26  don't quite understand.  The rifle was kept in the

27  car to scare to some birds?

50

1          INMATE DELUNA THROUGH INTERPRETER:   Yes,

2     Sir.   To scare the birds, scare the little animals.

3          DEPUTY DISTRICT ATTORNEY RICO:   Okay.   The

4     reports indicate that there were two weapons used,

5     a rifle and a shotgun.   Can you tell us about that?

6          INMATE DELUNA THROUGH INTERPRETER:   Yes,

7     Sir.   I'm not lying.   I'm telling you the truth.

8     There were there.

9          DEPUTY DISTRICT ATTORNEY RICO:   No.   But I

10    mean, how did the shotgun get involved in this

11    (inaudible)?

12         INMATE DELUNA THROUGH INTERPRETER:   Well, I

13    had it there also in the car because I used the

14    car.

15         DEPUTY DISTRICT ATTORNEY RICO:   But was

16    there both a rifle and a shotgun in the car?

17         INMATE DELUNA THROUGH INTERPRETER:   Yes,

18    Sir.   There was a (inaudible) and a .22 because I

19    used, for a few days I used the car, and there I

20    left the firearms.

21         DEPUTY DISTRICT ATTORNEY RICO:   Okay.   Okay.

22    And why, if Mr. DeLuna had the problem with the

23    victim and his friends at the bar, why did he go

24    home to bring back two firearms to the bar?   What

25    was his intention?

26         INMATE DELUNA THROUGH INTERPRETER:   That is

27    one of the things I would like to understand.   It's

51

1  a very big question, and I can't understand it, why

2  I had the firearms.

3  　　　　**PRESIDING COMMISSIONER ANGELE:**  He was at

4  the bar with his brother in a company truck.

5  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  Yes.

6  　　　　**PRESIDING COMMISSIONER ANGELE:**  He drove his

7  brother home in the company truck.

8  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  Uh-huh.

9  　　　　**PRESIDING COMMISSIONER ANGELE:**  Okay.  He

10  changed into his own car.

11  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  I have

12  two beers in my truck, the beers.  I got the car

13  and I came.

14  　　　　**PRESIDING COMMISSIONER ANGELE:**  Why did he

15  go back to the bar with two weapons?  What was his

16  reason why?

17  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  The

18  reason was just to drink.  That was all.

19  　　　　**ATTORNEY TARDIFF:**  No.  Why did you have the

20  rifles with you when you went back to the bar?

21  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  The

22  rifles were already there in the car.

23  　　　　**PRESIDING COMMISSIONER ANGELE:**  Okay.  Where

24  in the car were they?

25  　　　　**INMATE DELUNA THROUGH INTERPRETER:**  Right

26  here.

27  　　　　**DEPUTY DISTRICT ATTORNEY RICO:**  Mr. DeLuna,

52

1      reports indicate that when Mr. DeLuna drove back to

2      the bar, he didn't go in to drink, that he waited

3      outside for the victim.   Why did he do that?

4           INMATE DELUNA THROUGH INTERPRETER:   No.   I

5      was going in when I got there.   (inaudible) there

6      at the door, and that's when we started talking

7      again and arguing, talking bad, and that's when we

8      got into it, and that's what happened, what

9      happened was in the parking lot.

10          DEPUTY DISTRICT ATTORNEY RICO:   So did Mr.

11     DeLuna have the rifle with him as he started to

12     walk back to the bar?

13          INMATE DELUNA THROUGH INTERPRETER:   No.   No.

14     No.   That was there outside.

15          DEPUTY DISTRICT ATTORNEY RICO:   So there was

16     some other incident between Mr. DeLuna and the

17     victim outside after he returned to the bar before

18     he shot the victim?

19          INMATE DELUNA THROUGH INTERPRETER:   I didn't

20     understand that.

21          DEPUTY DISTRICT ATTORNEY RICO:   Sure.   I

22     guess I'm a little bit confused here.   He indicates

23     that he went home, switched vehicles, and drove

24     back to the bar to drink; is that right?

25          INMATE DELUNA THROUGH INTERPRETER:   That's

26     correct because I went and got it.

27          DEPUTY DISTRICT ATTORNEY RICO:   Okay.   And

53

1    as he was going into the bar, he met the victim

2    outside.

3            INMATE DELUNA THROUGH INTERPRETER:  Outside.

4            DEPUTY DISTRICT ATTORNEY RICO:  And then

5    what happened?

6            INMATE DELUNA THROUGH INTERPRETER:  That's

7    where it happened?

8            DEPUTY DISTRICT ATTORNEY RICO:  What

9    happened?

10           INMATE DELUNA THROUGH INTERPRETER:  We

11   started to talking again, you know, bad about

12   fighting, and me too.

13           DEPUTY DISTRICT ATTORNEY RICO:  So how did

14   Mr. DeLuna wind up with a rifle and shooting the

15   victim?

16           INMATE DELUNA THROUGH INTERPRETER:  Because

17   he also threatened to kill me, and that's when it

18   started.

19           DEPUTY DISTRICT ATTORNEY RICO:  But when did

20   Mr. DeLuna get the rifle?

21           INMATE DELUNA THROUGH INTERPRETER:  Well, at

22   that moment, the rifle, that we started to, you

23   know, talking bad to each other.

24           ATTORNEY TARDIFF:  Well, did he follow you

25   to your car when you left the bar?

26           INMATE DELUNA THROUGH INTERPRETER:

27   (inaudible) come on there's my car.  Come on.

54

1          DEPUTY DISTRICT ATTORNEY RICO:    I'm not

2     trying to prolong this, but let me see if I can ask

3     it this way.   The probation report says that the

4     defendant and his brother and friend left the bar

5     and after awhile, so did the victim and his

6     friends, and the victim was about to enter his

7     vehicle when the defendant, driving a white car

8     with a passenger inside, circled the victim; is

9     that right?

10          INMATE DELUNA THROUGH INTERPRETER:    Yes,

11    Sir.

12          DEPUTY DISTRICT ATTORNEY RICO:    So Mr.

13    DeLuna was in his car circling the victim who was

14    on foot when Mr. DeLuna started firing the rifle;

15    is that right?

16          INMATE DELUNA THROUGH INTERPRETER:    Yes.

17    Because he had already threatened me.

18          DEPUTY DISTRICT ATTORNEY RICO:    Okay.   And

19    the report indicates that the victim was shot first

20    in the elbow; is that right?

21          INMATE DELUNA THROUGH INTERPRETER:    Yes,

22    Sir.

23          DEPUTY DISTRICT ATTORNEY RICO:    And then

24    after that, Mr. DeLuna fired another shot and shot

25    the victim in the mouth; is that right?

26          INMATE DELUNA THROUGH INTERPRETER:    Yes.

27          DEPUTY DISTRICT ATTORNEY RICO:    And there

55

1    was another shot that was fired to the rifle that

2    apparently hit a gas pump; is that right?

3            INMATE DELUNA THROUGH INTERPRETER:  Yes,

4    Sir.

5            DEPUTY DISTRICT ATTORNEY RICO:  Okay.  And

6    someone else in the car was shooting a shotgun at

7    the time, right?

8            INMATE DELUNA THROUGH INTERPRETER:  Yes,

9    Sir.

10            DEPUTY DISTRICT ATTORNEY RICO:  And who was

11    that?

12            INMATE DELUNA THROUGH INTERPRETER:  That was

13    shooting at?  I was the one that had the .12.

14            DEPUTY DISTRICT ATTORNEY RICO:  I'm sorry?

15            INMATE DELUNA THROUGH INTERPRETER:  I had

16    the .12.

17            DEPUTY DISTRICT ATTORNEY RICO:  Had the

18    what?

19            ATTORNEY TARDIFF:  The .12 gauge.

20            INTERPRETER MORENO:  The .12 gauge shotgun.

21            DEPUTY DISTRICT ATTORNEY RICO:  Okay.  The

22    victim was shot with the rifle, right?

23            INMATE DELUNA THROUGH INTERPRETER:  Uh-huh.

24    Yes, Sir.

25            DEPUTY DISTRICT ATTORNEY RICO:  Well, who

26    was firing the rifle?

27            INMATE DELUNA THROUGH INTERPRETER:  I had

56

1    already shot with the rifle.

2         PRESIDING COMMISSIONER ANGELE:  Mr. Rico,

3    we're getting nowhere fast.

4         DEPUTY DISTRICT ATTORNEY RICO:  Okay.

5    (Inaudible.)

6         PRESIDING COMMISSIONER ANGELE:  I think it's

7    probably obvious we have an individual admitting

8    total responsibility.

9         DEPUTY DISTRICT ATTORNEY RICO:  Okay.  I

10   understand.  Let me ask it this way.  The only

11   point, the issue, and let me just ask this one.

12   Was Mr. DeLuna's brother in the car with him at the

13   time this took place?

14        INMATE DELUNA THROUGH INTERPRETER:  Yes,

15   Sir.

16        PRESIDING COMMISSIONER ANGELE:  Time out.

17   Was he in the car with you when you shot the

18   victim?

19        INMATE DELUNA THROUGH INTERPRETER:  Yes,

20   when I shot.

21        PRESIDING COMMISSIONER ANGELE:  Okay.

22        DEPUTY DISTRICT ATTORNEY RICO:  And is this

23   the same brother that your parole plans include

24   going back to stay with?

25        INMATE DELUNA THROUGH INTERPRETER:  No, Sir.

26        DEPUTY DISTRICT ATTORNEY RICO:  Okay.  I

27   think Mr. DeLuna has referred to this shooting

57

1    before as, well, he referred to it today as an

2    error, and he's referred to it before as an

3    accident.   Does he still maintain that?

4            **INMATE DELUNA THROUGH INTERPRETER:**  No, Sir.

5    What I think is that it's because of ignorance.

6            **DEPUTY DISTRICT ATTORNEY RICO:**  Okay.  The

7    last area I just wanted to ask about.   In the

8    probation report it also refers to a woman who had

9    picked up her daughter and her daughter's friend

10   and was driving nearby at the time of this

11   incident, and she identified as the defendant, she

12   identified the defendant driving by in his vehicle

13   and a second person in the car handed him the rifle

14   and then the defendant fired a shot at them.   Why

15   did he do that?

16           **INMATE DELUNA THROUGH INTERPRETER:**

17   (inaudible) the victim.   That's why I shot.   I

18   didn't know it was a lady.   If you want to believe

19   it, believe me, but I thought it was the other one.

20   That's why I shot at her.   That's when I found out

21   that it was a lady.   (inaudible) if you want to

22   believe me, believe me.   I can't do anything about

23   it.

24           **DEPUTY DISTRICT ATTORNEY RICO:**  Now, just so

25   I understand.   Is Mr. DeLuna saying that he did

26   fire a shot at a vehicle?

27           **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

58

1    Sir.  Yes.  I hit a vehicle.

2         DEPUTY DISTRICT ATTORNEY RICO:  Okay.  And

3    why was that?

4         INMATE DELUNA THROUGH INTERPRETER:  Because

5    --

6         PRESIDING COMMISSIONER ANGELE:  He's already

7    answered the question, Mr. Rico.  He said because

8    he thought it was another party who was with the

9    victim he shot.  Maybe you can't hear that.

10        DEPUTY DISTRICT ATTORNEY RICO:  It was a

11   little difficult with both the interpreter and him

12   talking at the same time.

13        PRESIDING COMMISSIONER ANGELE:  Mr. Moreno,

14   when you interpret for him, let him stop because I

15   can understand it gets a little --

16        INTERPRETER MORENO:  Okay.

17        PRESIDING COMMISSIONER ANGELE:  Because I

18   can hardly hear him.

19        DEPUTY DISTRICT ATTORNEY RICO:  How does Mr.

20   DeLuna, if he were to be paroled, if he were to be

21   returned to Mexico, how does he intend to support

22   himself in Mexico?

23        INMATE DELUNA THROUGH INTERPRETER:

24   (inaudible) is to help my parents take care of the

25   animals, help them, and to continue with my program

26   of Alcoholics Anonymous, and help.

27        DEPUTY DISTRICT ATTORNEY RICO:  Okay.  But

1    does Mr. DeLuna have a plan for making money?

2          **INMATE DELUNA THROUGH INTERPRETER:**  Yes,

3    Sir.  Plenty, beans and corn, (inaudible) can be

4    planted over there also.

5          **DEPUTY DISTRICT ATTORNEY RICO:**  Is Mr.

6    DeLuna familiar with the 12 Steps?

7          **INMATE DELUNA THROUGH INTERPRETER:**  I don't

8    know them all but some.

9          **DEPUTY DISTRICT ATTORNEY RICO:**  What's the

10   most important Step to him?

11         **INMATE DELUNA THROUGH INTERPRETER:**  Number

12   eight.

13         **DEPUTY DISTRICT ATTORNEY RICO:**  And what is

14   that?

15         **INMATE DELUNA THROUGH INTERPRETER:**  To

16   admit, we made a list of all the people that we

17   have injured.

18         **DEPUTY DISTRICT ATTORNEY RICO:**  And has Mr.

19   DeLuna done that?

20         **INMATE DELUNA THROUGH INTERPRETER:**  I've

21   been studying it.

22         **DEPUTY DISTRICT ATTORNEY RICO:**  Who is at

23   the top of his list?

24         **INMATE DELUNA THROUGH INTERPRETER:**  You are.

25         **DEPUTY DISTRICT ATTORNEY RICO:**  I don't

26   quite understand.

27         **PRESIDING COMMISSIONER ANGELE:**  Mr. DeLuna,

1    you made your list (inaudible).

2        INMATE DELUNA THROUGH INTERPRETER:

3    (Inaudible.)  To accept the injuries that you've

4    done to others.

5        PRESIDING COMMISSIONER ANGELE:  The top, the

6    top of the list, number one.

7        INMATE DELUNA THROUGH INTERPRETER:  God.

8        DEPUTY DISTRICT ATTORNEY RICO:  Thank you.

9    And I have nothing further.

10       ATTORNEY TARDIFF:  No questions.

11       PRESIDING COMMISSIONER ANGELE:  Closing,

12   please, Mr. Rico.

13       DEPUTY DISTRICT ATTORNEY RICO:  Thank you.

14   Well, --

15       DEPUTY COMMISSIONER RODRIGUEZ:  Excuse me,

16   counselor.  I need to turn tapes over again.

17      [Thereupon, the tape was changed to tape two.]

18       DEPUTY DISTRICT ATTORNEY RICO:  Thank you.

19   Again, I'll try to keep this as focused and brief

20   as I can, but I read the recent Appellate Decision

21   which mandates a new hearing, and I note that there

22   are some references in that that talk about the

23   crime in this case as not being, quote, "especially

24   egregious when compared to other murders," unquote.

25   And so I need to refer to this because I think it's

26   important to have the record established just what

27   is involved here in this life offense.  The

```
 1    probation report is in the file.  There's been
 2    reference to it.  Mr. DeLuna has (inaudible) to
 3    some aspects of it, but it looks like we have a
 4    situation where on the date of the offense, July
 5    7th, 1985, Mr. DeLuna, who today admits that he is
 6    an alcoholic and a drunk, started drinking early in
 7    the morning apparently while he was at work.  He
 8    drank throughout the day, went home and drank, went
 9    to the flea market and continued drinking.  And I
10    think it's important to note that in spite of all
11    this drinking, Mr. DeLuna still thought that it was
12    all right for him to drive from one location to
13    another, either from where he was working to home
14    or from home back to the flea market and then from
15    the flea market to the bar with his brother.  And
16    then the drinking continued at the bar, so it looks
17    like a day, an entire daylong drinking episode.
18    And then there's the altercation with the victim
19    and the victim's friends, and it may very well be
20    that the victim hit or somehow angered Mr. DeLuna.
21    I note that in the probation report there was a
22    reference -- Let me strike that at this point.  But
23    in the probation report it talks about the
24    circumstances of the crime, and what Mr. DeLuna has
25    said today has wandered a little bit from the
26    circumstances reported in the probation report.
27    But even under what he said today, it seems that
```

62

1    the altercation at the bar between Mr. DeLuna and

2    victim took place and then Mr. DeLuna drove home

3    where he swapped out vehicles and got his car which

4    contained two firearms, a rifle and a shotgun, and

5    then he returned to the bar.  And it's a little

6    equivocal as to why he returned at that point, if

7    he was going to continue drinking or if there was

8    some other motive.  And looking at the psych

9    report, the most recent one the 2001 at page four,

10   what Mr. DeLuna apparently told the evaluator there

11   is this, that Mr. DeLuna claimed that as the victim

12   was hitting him at the bar he was trying to fend

13   off the blows, Mr. DeLuna alleged the victim

14   started cursing at him and then stated, you better

15   leave or I'm going to kill you.  Mr. DeLuna then

16   indicated that he got in his truck, drove home, and

17   became, quote, "very upset and angry, I lost all

18   reasoning," unquote.  Mr. DeLuna reported that he

19   had a rifle in his car and he returned to

20   Rosarita's.  He denied having any intention of

21   killing the victim.  Mr. DeLuna claims that when he

22   saw the victim in the parking lot, the victim

23   started moving quickly towards his vehicle.  Mr.

24   DeLuna stated that he then pulled out his rifle and

25   started shooting at the victim thinking that he was

26   going for a firearm, although, he acknowledged he

27   never had a firearm.  Today, Mr. DeLuna is

63

1   indicating that he actually had the .12 or the
2   shotgun, so I don't know if he's saying that he
3   used both the rifle which inflicted the fatal
4   wounds and the shotgun personally, or if he's
5   trying to take some responsibility off his brother
6   who apparently was in the car, and who he has never
7   wanted to talk about there being a second shooter.
8   But in any event, it is true that he has taken full
9   responsibility for this crime.  Today he indicates
10  that he also shot at the vehicle, which apparently
11  contained a mother and her daughter and a friend,
12  thinking that it was other people.  So we have an
13  offense here that involved an altercation.  What
14  was extremely is that an altercation can take
15  place.  Alcohol can be involved.  It's a fueling
16  force quite often that precipitates violence.  But
17  here we have an individual that although he had
18  been drinking heavily, nevertheless, he chooses to
19  go home, arm himself with not one but two weapons,
20  return with another individual in the car, and then
21  the indications are from the report that, and Mr.
22  DeLuna agreed with that a few minutes ago, that he
23  returns and begins circling the victim, who is on
24  foot while the defendant is driving his car.  So
25  the defendant is driving his car in a circle around
26  the victim who's on foot, and the report indicates
27  the defendant and his passenger were each observed

64

1    to be holding rifles or weapons.  Mr. DeLuna hasn't

2    owned up to the other passenger doing anything, but

3    the bottom line is that there was a stalking

4    involved here by Mr. DeLuna, who was driving his

5    vehicle, following the victim who was on foot.  And

6    the victim was shot and struck in the elbow, and he

7    fell bleeding, and then he got up and walked around

8    to the other side of his car and yelled at Mr.

9    DeLuna, go ahead and kill me, which was a poor

10   choice of words, no doubt, on his part.  And at

11   that point, Mr. DeLuna fired another shot striking

12   the victim in the face, and I note this is a rifle

13   that is being fired.  The victim because apparently

14   the coroner indicates in the probation report that

15   in addition to the superficial wound to the left

16   elbow, there was a wound at a right angle to the

17   mouth, so after the victim was shot the second time

18   in the face at a right angle to the mouth, the

19   victim continued upright walking around spitting

20   blood and teeth fragments.  But then he walked

21   across the parking lot towards a stack of wooden

22   boxes, and the defendant, Mr. DeLuna, tracked the

23   victim in his vehicle and fired another shot which

24   struck a gas pump in the vicinity.  The victim

25   continued to walk away along and among the wooden

26   boxes calling for his brother.  While the victim

27   continued to wander around the parking lot in the

1    boxes, the defendant continued to pursue him in his

2    car.  The victim, at one point, ran between two

3    stacks of boxes, and it was at this time that Mr.

4    DeLuna shot him a third time in the back.

5    According to the coroner, that wound, the fatal

6    wound, entered the right upper back and exited the

7    left upper chest according to the probation report.

8    As a result of that wound, the victim suffered

9    perforation of the right posterior chest wall, the

10   aorta, the left lung, and the left chest wall.  The

11   victim, incidentally, was a .14 BA and therefore

12   intoxicated and vulnerable himself in addition to

13   being unarmed.  The victim, even after being shot

14   with this wound that would prove fatal, ran across

15   the parking lot towards his vehicle and then to

16   Rosarita's trying to gain entry, but the door was

17   locked, and the victim collapsed on the porch, and

18   the defendant fled the area.  Now, it's at this

19   time this defendant fled the area that apparently

20   he encountered Ms. Nagy, N-A-G-Y, who had picked up

21   her daughter and her daughter's friend at the

22   Granada Theater and was driving southbound on Depot

23   Street approaching Third Street.  And as she

24   crossed Third Street, she encountered the defendant

25   fleeing in his vehicle.  It made a turn in her path

26   and caused her to stop abruptly.  The white vehicle

27   then turned facing her.  It approached her from the

66

```
 1    opposite direction and stopped and it came
 2    alongside her.  She said she and the driver of the
 3    car, the defendant, made eye to eye contact, and
 4    she stated she could see the passenger and the
 5    defendant a rifle.  She stated the defendant then
 6    pointed the rifle out of the driver's window of his
 7    vehicle and fired in her direction but missed her.
 8    She got his license plate number, and the car was
 9    subsequently traced to the defendant.  Now, Mr.
10    DeLuna has indicated that he just fired at this
11    vehicle because he thought friends of the victim
12    were in it.  But according to the driver of the
13    car, this is Nagy, she indicates that he was right
14    alongside her, and they made eye to eye contact,
15    and I submit that it's also reasonable to indicate
16    that maybe this was just, there was a witness to
17    him at that point which is why he fired at her.  So
18    when I read this Court of Appeal Opinion that talks
19    about the reference to this not being a terribly
20    egregious crime, what I'm seeing here are a
21    continued course of criminality.  And why was this
22    done?  Again, referring to the psych eval, in the
23    psych eval at page four as I referred to before,
24    Mr. DeLuna indicated that he was very upset and
25    angry.  Now, we have alcohol fueling this, but we
26    have lack of impulse control.  We have anger.  We
27    have planning and premeditation to go and acquire
```

1    the weapons, come back to the scene, wait, lie in

2    wait, and then stalk the vulnerable victim.  He was

3    not deterred by shooting him once, twice, and a

4    third fatal time but then fleeing the scene, he

5    thinks it necessary to stop and fire at a woman

6    with two younger people in the car as well, all the

7    while, having driven for apparently some distance

8    under a high state of intoxication in a car where

9    he kept weapons as a matter of course to

10   purportedly scare animals, whatever, I don't know

11   how he intended to scare animals if he talked about

12   shooting at them to scare them away or waving a gun

13   at them.  And how did Mr. DeLuna describe all of

14   this initially?  He said starting out at this

15   hearing that he made an error, an error.  He's

16   talked about this before as an accident.  This is

17   so far and away above and beyond your garden

18   variety second-degree murder with aspects of having

19   an opportunity to cease and not taking advantage of

20   it, even after he's fired one shot which was

21   minimal, a second shot which was not fatal, but

22   then engaging and continuing in this course of

23   conduct is -- There's so much evidence here of a

24   first.  The only thing that would cut against it

25   would be the alcohol.  And back to the alcohol

26   issue, what's troublesome is that when I look at

27   the Board report Mr. DeLuna in his prisoner's

```
1    version at page two of the current Board report
2    says that he'd been drinking all day and does not
3    remember all of the details, but he's been pretty
4    good with details today.  As far as the psych
5    report, I know we're having the Court ordered
6    hearing, and the only, the most current psych eval
7    available is October of 2001.  That report is kind
8    of a mixed bag here.  First of all, it says in
9    terms of substance abuse history that Mr. DeLuna is
10   talking about, has talked about using alcohol,
11   starting to use it at the age of 17, denying any
12   use of illicit drugs.  Initially, he informed the
13   examiner that he consumed approximately one or two
14   beers everyday and perhaps a six-pack on the
15   weekends.  Well, what he's indicated today is far
16   and away above that usage on the day in question,
17   and the evaluator in the psych report indicates, as
18   the interview progressed, it became apparent that
19   Mr. DeLuna's use of alcohol was likely much more
20   extensive.  And yet at that time, Mr. DeLuna denied
21   having a problem with alcohol.  So when it comes to
22   conclusion in that evaluation, it talks about risk
23   of violence, and it's hard to really consider this
24   evaluation as reliable because it talks about the
25   tests that were used, and it talks about the
26   current research supporting an empirically based
27   risk assessment, and it said that since Mr. DeLuna
```

69

```
 1    is from a different cultural background, these
 2    instruments have, quote, "questionable validity,"
 3    unquote, and nevertheless, it puts him in the low
 4    range of severity, but then right away it follows
 5    it up by saying, however, these results need to be
 6    interpreted cautiously since these instruments have
 7    questionable validity for individuals from
 8    different cultures.  It goes on to say that overall
 9    Mr. DeLuna appears to have a low level of risk, and
10    the index offense appears to be an isolated
11    incident.  I'm not so sure that that's actually
12    valid given the extent of the drinking.  And it
13    says, however, it should be noted that Mr. DeLuna
14    appears to have a more serious problem with alcohol
15    than he's acknowledging.  I just believe that that
16    problem hasn't truly been addressed here.  Mr.
17    DeLuna talks about the 12 Steps.  He talks about,
18    you know, continuing with his alcohol problem or
19    program, alcohol program, excuse me.  When asked
20    about who he puts at the top of his list of people
21    that he has offended or have been impacted by his
22    alcoholism, he puts God there, and I understand the
23    thought that he is perhaps indicating that he is
24    repentant against God, but I don't really hear here
25    remorse, coming to terms with the crime let alone
26    that problem that has caused this whether it be
27    alcohol, anger, pride for being hit by the victim
```

70

1   in the company of his brother and friend, but
2   there's a lot of issues here that are still
3   unresolved, that have not been addressed in a
4   psychiatric evaluation, and I see no reasonable
5   expectation that if Mr. DeLuna were to be released
6   back into the free community one of his first stops
7   wouldn't be back in a bar.  I recognize that he is
8   not apparently had any alcohol-related problems
9   while he's in a controlled setting, but I don't
10  believe that while he's incarcerated, I recognize
11  counsel will probably say, well, it's easy to get
12  alcohol behind bars, and that's true, but it is
13  also far easier to abstain from alcohol in prison
14  than it would be to avoid the temptation upon
15  release.  And if he intends to go back to Mexico,
16  work at his parent's farm, again, work out farming
17  in the hot environment, perhaps even hotter
18  environment of Mexico which drove him to drink on
19  the morning in question and throughout that day,
20  that history wouldn't repeat itself.  And if he
21  gets out there, finds he's thirsty and starts
22  drinking a beer and having further alcohol to relax
23  later in the day and then goes out to a bar, maybe
24  this would be a reoccurrence of a problem on the
25  other side of the border, but it would still be a
26  high likelihood of a reoffense if somebody crosses
27  him or offends him or he again gets angry under the

71

1    influence of alcohol.  So I think, all things

2    considered, that Mr. DeLuna still needs to work not

3    only on his parole plans because I didn't hear a

4    real answer to making money.  He's talking about

5    being on the farm, and it sounds like maybe kind of

6    being taken of by his parents.  He's 50 years old,

7    and I think that he needs to work more on his

8    programming so that he can become self-sufficient

9    and not lapse back into a situation which may cause

10   him to reoffend.  And I don't think there's been an

11   adequate showing of remorse or coming to terms with

12   the crime or evidence of positive change other than

13   perhaps a recent acceptance on his part that he's a

14   drunk.  But when he repeatedly refers to it as an

15   error or an accident and I haven't heard a lot of

16   remorse, I don't see that there's been a

17   significant change except for the fact that he's

18   been incarcerated and forcibly kept away from

19   alcohol.  So all in all, I think that this crime

20   which involves multiple victims, multiple

21   criminality, that there seems to be an inability to

22   curtail -- Was that, I heard a click.  I wasn't

23   sure if that was a tape.  That in any event, Mr.

24   DeLuna is not anywhere near suitable for parole.

25   There is still issues that he needs to resolve, and

26   I anticipate that it's going to take some time for

27   him to do that.  I would ask that he be found not

72

1   suitable at this time.  It's true that he should be

2   commended for certain things that he has done.

3   He's working to not offend violently on the inside,

4   and he's programming to some extent.  And I

5   recognize that there's a medical issue at this

6   particular point, but hopefully, after the medical

7   issues are favorably resolved, I would hope, that

8   he can return to programming that is going to be

9   intensely necessary for him before he can again

10  become safe to the community outside the prison

11  walls, and I would ask that he be found not

12  suitable in a multi-year denial at this point.

13  Thank you.

14       **PRESIDING COMMISSIONER ANGELE:**  Ms. Tardiff,

15  closing, please.

16       **ATTORNEY TARDIFF:**  Thank you.  In terms of

17  the commitment offense, it is noted in the

18  counselors' reports that there is a significant, I

19  argue, mitigating factor in that he had no prior

20  criminal history at all.  Further in the '01 and

21  the '98 psych eval, they both make a point of

22  stating that Mr. DeLuna was remorseful for this

23  commitment offense.  He has always admitted

24  culpability from the time that the crime occurred,

25  and he at an early stage of the proceedings, I

26  argue, he came clean on this which should also be

27  another mitigating factor.  In terms of his

73

1    preconviction history, his social history, and this

2    is also pointed out in the Court of Appeals

3    Decision, is in fact stable.  He came from an

4    intact, large, close knit family.  He worked the

5    family farm.  He maintained steady work employment

6    after coming to the United States, and again, he

7    had no prior criminal history.  In terms of his

8    alcohol abuse, the Court of Appeals notes that

9    there was no evidence that this abuse contributed

10    to a history of unstable or tumultuous

11    relationships.  And in terms of the issue of the

12    gun, the Court of Appeals pointed out that there

13    was conflicting evidence; therefore, it was

14    insufficient to even amount to some evidence.  The

15    fact that he had a limited education at the time of

16    the commitment offense does not amount to making

17    him have an unstable social history as well and

18    should not in fact be used against him.  Mr.

19    DeLuna's institutional behavior has been supportive

20    of release.  He has participated in beneficial

21    self-help, most recently the Impact Program,

22    Personal Growth Seminars, and AA.  He hasn't had

23    any 115s and only two 128s, excellent discipline

24    history.  He has tried to upgrade educationally,

25    has not obtained his GED, but the Court of Appeals,

26    again, notes that there doesn't seem to be any

27    connection between a lack of education and or lack

74

1    of proficiency in the English language to show that

2    his institutional behavior has not been positive.

3    His most recent psych eval of 8/01, and this is

4    based on the testing procedures, notes that he

5    scored well within the low range of severity.  I

6    know there's a caveat regarding the use of alcohol,

7    and perhaps Mr. DeLuna's denial at that time or

8    minimizing it, I think today he's cleared that up

9    in stating that he is in fact an alcoholic and that

10   he intends to continue participation in AA upon

11   release.  He has no mental health disorder.

12   Further, the psych eval states that this incident

13   that occurred was an isolated incident related to

14   intense situational factors and the disinhibiting

15   affect of alcohol intoxication.  Therefore, it's

16   unlikely that this same set of events would occur

17   again and that this would result again.  Therefore,

18   he poses, does not pose an unreasonable risk of

19   danger to others.  His parole plans are, I submit,

20   sufficiently solid.  He has strong family support.

21   He will be working on the family farm, and with

22   that, I will submit it.  Thank you.

23        **PRESIDING COMMISSIONER ANGELE:**  Thank you.

24   Now, Mr. DeLuna, you have a chance now to tell this

25   Panel, if you wish, why you believe you are

26   suitable for parole, or he can let the hearing end

27   on what the attorney has said on his behalf.

75

1        **INMATE DELUNA THROUGH INTERPRETER:**  I'll

2  leave it with what the attorney said.

3        **PRESIDING COMMISSIONER ANGELE:**  Thank you.

4  We're going to recess for deliberations.  The time

5  is approximately 5:25 p.m.

6                       **R E C E S S**

7                         --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

76

1          CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3        **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  We're

4.  back on record.  All parties have returned.

5        **PRESIDING COMMISSIONER ANGELE:**  This is in

6   the matter of Isidoro DeLuna, CDC number D David

7   16017.  The time is approximately 6:00; excuse me,

8   5:50 p.m.  Mr. DeLuna, the Panel has reviewed all

9   information received from the public and relied on

10  the following circumstances in that you're not

11  suitable for parole and would pose an unreasonable

12  risk of danger to society or a threat to public

13  safety.  Of course, we have the instant offense

14  that was carried out in a violent and brutal

15  manner.  There were multiple victims.  One was

16  killed.  The offense was carried out in a manner

17  which demonstrates a disregard for human life and

18  for public safety.  And the conclusions were drawn

19  from the Statement of Fact wherein the inmate on or

20  about the 11th day of December, 1974, after being

21  involved, excuse me, I'm sorry, that's July the

22  7th, 1985, excuse me, after being involved in a

23  verbal and then physical altercation with the

24  victim, one Fernando Rentorio, this is at a local

25  bar, restaurant, the inmate who had been drinking

26  all day drove the vehicle that he was in, a truck,

27  **ISIDORO DELUNA    D-16017.  DECISION PAGE 1  4/27/05**

1    to his residence, changed into his own vehicle

2    which contained two weapons, a shotgun and a .22

3    caliber rifle, and drove back to the bar after

4    having a couple of drinks at home. He said he was

5    going back to the bar and restaurant to drink. He

6    confronted Mr. Rentorio, and as a result, he shot

7    and killed the victim. He shot the victim once in

8    the back as he was trying to flee after shooting

9    him two other times, once in the face, and upon

10   leaving the scene did fire a weapon at a vehicle

11   containing a noninvolved party, a female with

12   children in the vehicle. The inmate claims he was

13   drunk during the offense and does not remember

14   parts of it; however, intoxication was a big part

15   of this crime, and the inmate states that he

16   committed this crime because of the altercation

17   that occurred at the restaurant, bar prior to him

18   driving the truck to his residence. The inmate has

19   no prior criminal history. Due to his being

20   medically unassigned, he has not been able to

21   program. He's not been able to be involved in a

22   marketable skill, and he's not been able to

23   participate in self-help while at this institution.

24   He has been 115 free during his total term of

25   incarceration receiving only two 128(a) counseling

26   chronos the last one being on February, excuse me,

27   **ISIDORO DELUNA    D-16017    DECISION PAGE 2    4/27/05**

78

1    April 25th, 2004, for delaying count.  The

2    psychological evaluation is interesting in that the

3    inmate today admits to being in his own words, a

4    drunk and an alcoholic.  In the psychological

5    evaluation dated 8/30/01, that's the latest full

6    evaluation by Dr. Eric Rueschenberg,

7    R-U-E-S-C-H-E-N-B-E-R-G, PhD.

8           "The risk for future violence in the

9           community was estimated using three

10          psychological instruments.  The

11          current research supports an

12          empirically based risk assessment as

13          being the most reliable and valid

14          procedure for assessing risk for

15          violence.  It should be noted that

16          since Mr. DeLuna is from a different

17          cultural background these instruments

18          have questionable validity.  The

19          three psychological instruments were

20          the HARE Scale, PCL-R, the History

21          Clinical Risk 20, HCR20, and the

22          Violence Risk Appraisal Guide, VRAG.

23          Collectively, these instruments

24          assessed static risk factors and

25          (inaudible) factors and actuarial

26          factors associated with future risk

27    ISIDORO DELUNA    D-16017    DECISION PAGE 3    4/27/05

79

1          for violence.  On the three measures,

2      ·   Mr. DeLuna scored well within the low

3          range of severity; however, as

4          mentioned above, the results need to

5          be interpreted cautiously since these

6          instruments have questionable

7          validity for individuals from

8          different cultures.  Conclusion,

9          overall, Mr. DeLuna appears to have a

10         low level of risk for violence,

11 ,       future violence, in the community.

12         The index offense seems to be an  ·

13         isolated incident related to intense

14         situational factors and the

15         disinhibiting affect of alcoholic

16         intoxication.  However, it should be

17         noted that Mr. DeLuna appears to have

18         had a more serious problem with

19         alcohol than he's acknowledging.  His

20         ability to maintain behavioral

21         control is indicated by the fact that

22       ·he has not received any CDC 115  ·

23         disciplinary reports while

24         incarcerated in prison.  If Mr.

25         DeLuna is to remain in prison, it is

26         recommended that he continue to

27    **ISIDORO DELUNA    D-16017    DECISION PAGE 4  4/27/05**

```
 1          remain disciplinary-free, that he
 2          improve his English skills, and that
 3          he participate in AA."
 4  I want to emphasize once again that the inmate
 5  today very clearly indicated that he believes he is
 6  a drunk and alcoholic.  That is something that
 7  hopefully the new psychological evaluation will
 8  clear up when it is done.  The inmate does seem to
 9  have parole plans not in California but in
10  Minnesota, and he also plans to go back to Mexico.
11  He does have an INS Hold against him, living at a
12  family farm where he'll be planting different crops
13  and that the farm would appear to be with him
14  staying with the family.  The Hearing Panel notes
15  that in response to 3042 Notices indicating an
16  opposition to a finding of parole suitability,
17  specifically, the District Attorney of Santa Clara
18  County was present by way of video conference
19  voiced opposition to parole suitability.  The
20  inmate should be commended for having no 115s
21  during his incarceration, for being involved to the
22  degree that he has been involved in in self-help
23  programs, for being involved in ESL, and also for
24  obtaining two certificates in vocational
25  landscaping.  However, these positive aspects of
26  his behavior do not outweigh the factors of
27  ISIDORO DELUNA    D-16017    DECISION PAGE 5   4/27/05
```

81

1 . unsuitability.  I want to add that the inmate needs

2 additional time in order to fully understand and

3 deal with the consequences of his act.  The denial

4 is for a period of one year.  During that year we

5 ask that you remain disciplinary-free, if available

6 once he is no longer medically unassigned, get

7 involved in self-help, and also to cooperate with

8 clinicians in the completion of a clinical

9 evaluation, specifically, to talk about insight in

10 the inmate's alcohol abuse.  I'm going to ask that

11 a new psychological evaluation be conducted, and I

12 want the record to be clear that this has to do .

13 with the inmate's today clearly admitting to his

14 being alcoholic and a drunk, and also I think it's

.15 obvious today that the inmate had a severe language

16 problem due to his Spanish, and even with an

17 interpreter, even with an interpreter, has a hard

18 time explaining himself.  For example, using words

19 like hit and throw, or hitting and throwing, to

20 describe shooting at the victim.  He also appears

21 to get flustered when unable to fully explain

22 himself, and some statements get lost even in the

23 interpretation.  It is clear to this Panel that

24 some of the statements that the inmate makes from

25 the statements that he may give are because of

26 cultural ramifications, language barrier, and him

27 **ISIDORO DELUNA    D-16017    DECISION PAGE 6    4/27/05**

82

1   attempting to describe things in words that are not

2   usually used to describe them which is not meant to

3   say it is sounding bad on his part.  It is meant to

4   say that merely there is a situation involved in

5   this particular case that he uses different wording

6   and sometimes those wordings may put him in a box,

7   so to speak, meaning he gets stuck in a spot where

8   people assume he says something and means something

9   when he doesn't really mean that.  Does he

10  understand what I'm trying to say?  It is not meant

11  to be negative.

12          **INMATE DELUNA THROUGH INTERPRETER:**  No.

13  That's fine.

14          **PRESIDING COMMISSIONER ANGELE:**  Any

15  comments, Commissioner Rodriguez?

16          **DEPUTY COMMISSIONER RODRIGUEZ:**  I concur

17  with Commissioner Angele.  Good luck, sir.

18          **PRESIDING COMMISSIONER ANGELE:**  That does

19  conclude this hearing.  The time is approximately

20  6:00 p.m., and I wish you the best of luck, sir.

21                      --oOo--

22

23  **PAROLE DENIED ONE YEAR**

24  **THIS DECISION WILL BE FINAL ON:** AUG 2 5 2005 _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **ISIDORO DELUNA   D-16017   DECISION PAGE 7   4/27/05**

83

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KRISTIN LEDBETTER, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 82, and which recording was duly recorded at CALIFORNIA MEN'S COLONY, at SAN LUIS OBISPO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ISIDORO DELUNA, CDC No. D-16017, on APRIL 27, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated MAY 14, 2005, at Sacramento County, California.

KRISTIN LEDBETTER
Transcriber
**CAPITOL ELECTRONIC REPORTING**